Annie A. Wright et al. *v.* The Warrior Run Coal Company, Appellant.

*Mines and mining — Coal lease—Construction of by parties—Changed condition of business—Royalties.*

A coal lease executed by plaintiffs' ancestor in 1864 provided for a royalty of a certain amount per ton upon prepared coal, and a royalty of half the amount upon chestnut coal, which was the smallest size then marketable. At the date of the lease there were seven kinds of coal which, in the order of gradation as to size, were lump, steamboat, broken, egg, stove (No. 3), stove (No. 4) and chestnut. Lump and steamboat coal were the large pieces separated by the miner's blast. The other kinds were obtained by screening through parallel iron bars. The production of chestnut coal was at the time of the lease about fifteen per cent of the output of the mine. Subsequently lump and steamboat coal ceased to be marketable, and the lessee was compelled to break these kinds into smaller sizes. Two new kinds of coal, both smaller than chestnut, and known as pea and buckwheat, came to have a market value, although at the date of the lease

such sizes went into the culm bank as worthless. The lessees largely increased the production of chestnut coal, and sold large quantities of pea and buckwheat, the production of which was also largely increased, upon which latter sizes they refused to pay royalties. Plaintiffs' ancestor in his lifetime made a complaint of the undue production of chestnut coal, and protested against it, but his generosity having been appealed to by the lessee, he continued to receipt in full as theretofore until his death. There was no evidence that plaintiffs knew that the production of chestnut coal had been increased, or that they had waived any rights under the lease; or that the lessee had deliberately broken coal for the primary purpose of avoiding payment of royalties. *Held*, that the lessor, by protesting against a construction of the lease which reduced his royalties, and at the same time receipting in full for the lesser amount, waived the right of himself and his descendants to recover the correct amount, but his conduct cannot be considered such an interpretation of the lease as to prevent his descendants, who are his legal representatives, from asserting a different interpretation of it; therefore plaintiffs were entitled to full royalties upon all chestnut and pea coal in excess of fifteen per cent of the product of the mine; but they were not entitled to recover royalties on such excess as their ancestor had settled for.

*Mining lease—Coal used in operation of mine—Royalties—Custom.*

Under the custom which prevails in the anthracite coal region, coal used by a lessee in the operation of the furnaces of the mine is not subject to royalties unless provision is made therefor in the lease.

Argued April 13, 1897. Appeal, No. 146, Jan. T., 1897, by defendant, from decree of C. P. Luzerne Co., June T., 1890, No. 2, on bill in equity. Before WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed as modified. MITCHELL, J., dissents.

Bill in equity for an account of royalties.

The decree of the court below from which the defendant appealed, as well as the facts, appear by the opinion of the Supreme Court.

*Errors assigned* were in overruling exceptions to master's report.

*Samuel Dickson* and *Alexander Farnham*, for appellant.— This case is one of the greatest importance, not only to the defendant here, but to every coal mining enterprise in the whole anthracite region of Pennsylvania, operating under leases made before the year 1873 and thereabouts. This was about the time

when the modern system of rebreaking large sizes of coal into the smaller "prepared" sizes came into vogue. In case the general principle contended for by the defendant should not be sustained by the court, there will be a general upheaval among coal operators under leases, the result will be to open the flood gates of litigation in every anthracite producing county; and enterprises which have been prosecuted in good faith on approved methods as to the preparation of coal for market, during the past twenty-four years, will be brought to account for an alleged excessive production of smaller descriptions of coal during that period, notwithstanding the general notoriety of these methods of preparation in general use during all that time.

The main question involved in this case, and from which the claim against the defendant results, arises out of its practice of breaking down "lump" and "steamboat" coal and the size next, called "broken," for the purpose of preparing "egg" and "stove" sizes for market. This practice is of universal prevalence in the collieries throughout the coal field. "Steamboat" coal, as a distinctive kind or description, has ceased to exist; it is no longer called for or known in the market. It passed over bars five or six inches apart as it came from the mine car, and was in all respects "lump" coal (being broken by machinery, and of irregular shape like lump), and is at this day a part of the "lump" coal production, whenever coal of this description is specially ordered by a consumer.

The defendant has a right, under the lease, to break and prepare its coal product into any one or more of the sizes of "prepared" coal, accordingly as its interest or the market demand may dictate, even though the production of chestnut and smaller sizes and waste of coal be thereby incidentally increased, provided that such increase be only incidentally—not purposely made.

Where there is a necessity for an increased preparation of the coal into the domestic sizes, and this involved an incidental increased chestnut production, the lessor's conduct must be taken as implying a recognition of the defendant's right to produce the domestic sizes of prepared coal in any relative proportion, or all of one kind, notwithstanding its involving an increased chestnut and waste production: Alden's App. 93 Pa. 182.

Covenants are to be construed according to the intentions of

the parties as nearly as the words will permit; and there is no surer guide to the understanding and intentions of the parties, when words are equivocal, than their acts and declarations under the agreement, commonly called its contemporaneous construction: Lehigh Coal & Nav. Co. v. Harlan, 27 Pa. 439; Berridge v. Glassey, 112 Pa. 450; Straus & Sons v. Wanamaker, 175 Pa. 231.

*George R. Bedford* and *H. W. Palmer*, for appellees.—We deny in the most emphatic terms that the consequences to flow from an affirmance of the decree are such as defendant's counsel has depicted. There will be no "upheaval among operators," and very little calling to account, because there is not another lease like the one in question, and certainly not another operator doing what this defendant is persistently attempting, that is, a practical confiscation of a very large proportion of the output of the plaintiffs' mine. As a matter of fact other operators, where there has been an overproduction of chestnut, have admitted their liability to pay, and have paid full price for the quantity of chestnut in excess of twelve and one half per cent.

The lessor did not take upon himself the vicissitudes of the coal trade. He was not engaged in the coal trade. He cannot profit by its gains nor suffer by its losses. He is limited by a fixed price, and if he cannot be benefited by a favorable market he surely should not be harmed when the market becomes more exacting.

The defendant's chief reliance in support of his claim that the lessor is affected by the subsequent changed conditions of the coal industry is Alden's App., 93 Pa. 182. With the decision of that case upon its facts we are in full accord, but upon the facts of our case it does not alter our position.

One of the distinguished counsel in Alden's Appeal, Mr. Hollingsworth, was some years later the master in Lance v. Coal Company, 163 Pa. 84. He certainly did not consider Alden's Appeal as against our claim.

The language of Chief Justice GIBSON, in Navigation Company v. Moore, 2 Wh. 477, is an authority in point.

There is no disagreement on the question of the right of the defendant to break up all the coal as fine as he pleases, but by thus breaking it up, whether on the plea that the market

demands it or for any other reason, he cannot escape his agreement to pay for what he mines according to the terms of his contract.

The parties had reference to the maximum capacity of the rollers when the lease was made.

OPINION BY MR. JUSTICE DEAN, October 11, 1897:

On November 28, 1864, by sealed agreement, Hendrick B. Wright, for himself and as guardian of his minor son, leased to Abel Barker and four others two adjoining tracts of land, one containing 125 acres, and the other 163 acres, in Hanover township, Luzerne county, for the purpose of mining coal thereunder, with privilege to farm the same, and also to cut timber therefrom to be used in their coal operations. The term was for ten years, with the right to the lessees to an extension of ninety-nine years at the end thereof. The consideration to be paid by the lessees is expressed in the following clause of the contract.

" The said party of the second part shall pay the party of the first part the following prices per ton for all coal mined during the said term; the ton in all cases to be twenty-two hundred and forty pounds (2240 lbs.) prepared coal. Chestnut coal to be half price; but coal shipped from the mines, which shall not have been prepared, shall not be subject to abatement because not prepared. For the first fifty thousand tons of coal mined in any one year, fifteen cents (15 cents) per ton; for the next twenty-five thousand tons in the same year, twelve cents (12 cents) per ton, and for any excess over and above seventy-five thousand tons in any one year of the term, ten cents (10 cents) per ton."

The royalties were to be paid quarterly, commencing with the date of the lease, and a stipulation for a minimum quarterly payment of not less than $1,250; the enforcement of the minimum payment, however, to commence only with the second year. It was further stipulated that in case the term should be extended for ninety-nine years the extended term should be subject to all the conditions and covenants of the ten years' term, except that, instead of the shifting scale of prices determined by the quantity mined, the price should be " 15 cents per ton for all quantities mined, chestnut coal, as hereinbefore stated, to be half price, or seven and one half cents per ton." As a mining cor-

poration by the lessees was contemplated, it was provided that they should have power to assign such lease to the corporation. Accordingly, on the organization of this defendant corporation about two months afterwards, the lease was assigned to it, and mining operations were commenced. From that date, January, 1865, until August 21, 1893, the defendant mined and shipped 1,460,760 tons. Plaintiffs admit that defendant accounted and paid for 1,298,336 tons, but allege that the difference, 162,724 tons, has not been paid for. This difference was made up of 156,400 tons of pea coal, and 6,024 tons of buckwheat coal, shipped and sold during the later years of operations under the lease. In addition to these quantities shipped and sold and not paid for, defendant burned under its boilers, for steam purposes, 75,000 tons of large size coal and 80,000 tons of pea and buckwheat coal.

The defendant having refused to pay for the pea and buckwheat coal shipped and sold, or for any coal used at the mine for steam purposes, plaintiffs filed this bill. The material complaints are:

1. That defendant has negligently and unskillfully mined the coal, so that the roof at places has fallen, and thereby rendered inaccessible large quantities of coal in place, which are now lost to plaintiffs.

2. That defendant, by changes in machinery and methods of preparing the coal for market, has largely increased the quantity of chestnut coal, for which the lower royalty is paid, and further, largely increased the quantity of pea and buckwheat coal, for which it denies its liability to pay any royalty.

3. That defendant has refused to render proper and full accounts of the coal actually produced and sold, on which royalties should be paid under a correct interpretation of the contract.

The prayers are:

1. That defendant account for all coal rebroken for the purpose of increasing the product of chestnut and smaller sizes, and for the coal rendered unavailable by its negligent, unskillful and improper mining, and also account for the whole product of the mines actually mined upon which it ought to have paid the stipulated royalty.

2. That defendant be restrained from further mining operations on the premises until it pays or secures to be paid all sums

of money due, or for which it is liable to the plaintiffs, and upon its failure to make payment or furnish such security during a reasonable time to be determined by the court, then that the lease be declared forfeited, possession of the premises be decreed and awarded to the plaintiffs, and the defendant be enjoined from prosecuting its mining operations or interfering with the plaintiffs' possession or control of same.

The three averments of the bill as stated were denied by defendant, and the issue thus made up was heard by Hon. L. H. Bennett, as examiner and master, and he, before the ending of the hearing having been elected judge of common pleas of Luzerne county, by agreement of the parties in writing, continued both as master and judge of the court until final decree.

As to the first complaint, averring damage from negligent and unskillful mining, the master, on competent evidence, finds the facts against the plaintiffs, and we discover nothing in the evidence to warrant us in disturbing this finding, and further notice will not be taken of it in appeal by plaintiffs from same decree.

As to the averment in the second specification of complaint, the master finds as a fact, that before and at the date of this contract there were "seven sizes, beginning with 'lump' coal as the largest and ending with 'chestnut' coal as the smallest size. The names of each were, lump, steamboat, broken, egg, stove (number three), stove (number four) and chestnut, respectively, and in that order of gradation as to size. Lump and steamboat coal,—the latter being somewhat smaller than the former,—were the larger pieces separated from the coal strata by the miner's blast. These came from the mine in the mine car, mixed with smaller pieces also resulting from the blasting operation. These smaller pieces which came from the mine in the mine car produced the other enumerated sizes, and where a greater quantity of these was desired, some of the lump and steamboat sizes were broken for that purpose. In general, it may be said, that the whole contents of the mine car, as mined and loaded into the car in the mines, and hoisted to the surface, were dumped into a chute leading to a series of iron bars located parallel with one another at the distance of five or six inches apart. The larger sizes of coal in the mine car, which did not drop through, but passed lengthwise over these bars, were lump

and steamboat coal. That which dropped through or between the bars was screened and separated into the different sizes of broken, egg, stove of both sizes, and chestnut coal, already specified. But, in case this would not produce a sufficient quantity of the five sizes last named, the desired amount was obtained by passing lump and steamboat sizes between revolving cylindrical rollers having projecting teeth with which to break or crack the coal, whereby these large pieces were broken into sizes like those which had passed between the bars, and these pieces thus broken, were screened in the same manner into the five sizes specified. Coal which passed through small meshes constituting the first screen went to the dirt or culm bank, as it is called, and was not marketed, because there was no sale or demand for such small sizes. Coal that passed over the meshes of the first screen and through those of a larger size in a succeeding screen was chestnut coal, the smallest size marketed. Similarly, that which passed over the meshes of the screen last referred to, and through larger ones in a further screen, was stove coal number four; and in like manner, by the succeeding screens of larger, graduated meshes, the larger sizes of screened coal up to and including so called broken coal, having a cubic diameter of about four inches, were produced. The term, 'prepared coal,' as then commonly understood in this locality in all coal transactions, embraced the five sizes of screened coal already mentioned, to wit: broken, egg, stove of both sizes, and chestnut; but no other kind of coal. Lump and steamboat on the other hand were coal not prepared. Under the system of rollers and appliances for breaking and preparing coal at that time,—even when all the lump and steamboat sizes were passed through the rollers, the total production of chestnut did not exceed fifteen per cent of the product of the mine, including in such product not only the chestnut and sizes above that, but also still smaller coal, equivalent to nine per cent of the mine product which went to the dirt bank in sizes that later came into use as pea coal. Much of the mine output in this section was lump and steamboat, and was used in the surrounding country in operating large furnaces for smelting iron ore, or under boilers for the purpose of generating steam. Lump and steamboat coal and the larger of the 'prepared' sizes were in far greater demand than the smaller sizes of prepared coal,

and the market prices for the former were correspondingly higher. As a result, a large portion of the lump and steamboat coal was not then broken, and the production of chestnut, although not uniform, was much less than fifteen per cent, as above specified, and such of the latter as was marketed was much below that of any of the other kinds of coal in price. Whatever of chestnut could be sold at a profit was regarded as a saving of so much coal, incidentally resulting from the miner's blast, the handling of coal before it came out of the mines and the roller process which had for its purpose the production of the larger and more valuable sizes of prepared coal. The size of chestnut ranged, according to different collieries, from that which went over a screen with meshes one half inch square, and through a screen with one inch meshes—the smallest size and the least used, to that which passed over a screen of three fourths inch meshes, and through one of one and one fourth inches—the largest and most prevalent size made. In some cases the lease prescribed given meshes for chestnut, and where this was not the case, the sizes differed within the range above indicated, according to different operators."

This clear and concise statement of the facts by the master relating to the preparation of the coal at the date of the contract is fully borne out by the evidence. He then finds that soon after defendant's operations commenced the demand for lump and steamboat coal rapidly fell off, and, within a very few years, practically ceased, while the demand for stove and chestnut coal greatly increased; that, about five years after the date of the contract, pea coal, a much smaller size than chestnut, and which, before that time, was thrown into the dump as worthless, acquired a market value, and defendant commenced and continued shipments and sales of it; that later, buckwheat coal, a still smaller size, became marketable, and defendant shipped and sold large quantities of it. To meet the changed demand, defendant ceased to produce for the market the larger sizes, such as lump and steamboat coal. To that end, it introduced additional rollers, which broke and rebroke the coal; it also introduced screens for the separation of the buckwheat coal; also, increased the size of the meshes through which the chestnut coal dropped, one eighth of an inch. These and other changes in methods and machinery were adopted for the preparation of the

coal to meet the new market demand.   As a result, the master finds that some coal which, under the old methods would have gone, in combination with bone and slate, to the dump, has been saved and paid for to plaintiffs, but that more than the equivalent of this saving, in consequence of the additional breaking to reduce it to smaller sizes, has been lost in dust and buckwheat coal, both being proportionately increased.   And, although the master finds the motive for the method in preparation was only to create a salable product, he also concludes, to use his own language, that while defendant "has not deliberately broken down coal for the primary purpose of avoiding the payment of royalties, yet the effect of this process has greatly diminished the value of the lessor's interest, when measured by the changed standard of production and payment of royalty.   The lesser royalty prescribed by the lease for chestnut coal, and the fact that the defendant has never paid any royalty for pea or buckwheat sizes, have, in connection with the conditions of the market, contributed to the greater production of stove coal—the highest grade in the product, and consequently, to a very large increase of chestnut and the smaller sizes; for the lesser market prices received for these smaller sizes have been more than counterbalanced in the greater one for stove coal, and in the lesser expenses on royalty account for the general coal product."

The master, then, by a course of reasoning which amply vindicates his conclusions, thus interprets the contract:

"In our opinion, nothing smaller than chestnut was to be paid for by the ton, and there was no intention of providing for payment on pea and buckwheat coal.   This conclusion derives much strength, in our mind, from the fact that the lease, whether as regards the original or the extended term, expressly provides only half price or seven and one half cents per ton for chestnut coal, the smallest size then known to the trade, and full price, or fifteen cents per ton, for all other kinds of coal to be paid for.   A construction whereby pea and buckwheat coal, then unknown to the market by reason of their inferiority even to chestnut coal, should be paid for at double the royalty placed upon chestnut, and at a royalty equal to that fixed for all the larger sizes, would be unreasonable, and, in our judgment, clearly unwarranted."

As to coal consumed under the boilers, he says :

"Our further conclusion is that payment was contemplated for only such of these three products of coal mined as should be sold and marketed, and that the terms of the lease, viewed in the light of its subject-matters, do not contemplate any per ton royalty for coal that may be used under the defendant's boilers. While the terms of the lease in this latter respect are not as clear as they might well have been made, we are nevertheless convinced of the correctness of our conclusions from a consideration of its context, the well known methods of hoisting and preparing the coal from the mines by means of the use of extensive steam power obtained by the incidental consumption of the coal itself, and the general purposes of the lease."

And this last conclusion, the master shows, from the terms of the lease and invariable custom, to be a correct one.

But, then arises another question, viz: Even if, by the terms of the lease, at the date of it, it was not in contemplation of the parties that any less size than chestnut should be paid for, nevertheless, is not the defendant, under a reasonable interpretation of the contract, answerable for additional royalty on account of the largely increased production of chestnut coal, altogether beyond the intention of the parties at the date of their contract, and because of the excessive production of pea coal, caused by the increased quantity of chestnut? The contract is silent as to what proportion of the whole product shall be chestnut, and be paid for at half price. The plaintiffs argue that the contemporaneous facts and customs of the mining business at the date of the contract must be assumed as having been within the contemplation of the parties, and that on such knowledge they contracted; that when half price was fixed for chestnut coal, they meant half price for such quantity as resulted from mining and preparation in that mining territory at that date. The defendant, in reply, argues that the lease provides for breaking the coal, and that its very silence as to the extent it shall be broken, or the proportion of the sizes, leaves defendant free to adopt such methods for the future as will adapt the coal to the market demand, without thereby increasing its liability for royalty. The master comes to this conclusion:

"In our opinion, the terms of the lease fairly contemplate the breaking of the whole mine product into the different sizes of

what was 'prepared coal' in 1864, with their proportionate percentages to one another, by means of the methods and appliances in general use at that time and the manner then employed of operating such appliances, if the demands of the defendant's market for selling coal reasonably require the breaking and preparation of the product to that extent, and the operation be performed 'with as much economy and as little waste as may be;' and payment of royalty measured by this standard is all that the contract calls for.   To this extent we concur with the position of counsel for the defendant; but we find nothing in the terms of the lease which contemplates the breaking of this mine product to a greater extent than that already indicated, and while new conditions of the market for the sale of the defendant's coal in competition with other operators has justified it in adopting methods and machinery by which not only all the mine product has been broken to prepared sizes, but to the smaller of these sizes, whereby a great proportionate increase of chestnut and pea coal has occurred, these were not contemplated by the contract, and therefore the plaintiffs are entitled to payments of royalty upon the standard above indicated."

While it is difficult to demonstrate that such was clearly the intent of the parties, it is very easy to show that the argument of defendant leads to an unreasonable conclusion, and one that works palpable injustice to the landlord; for, if payment under the contract be measured by the preparation of the coal to any size which defendant thinks may suit the market, then if the market demand is mainly for pea and buckwheat, and nearly all of it be crushed to those sizes, plaintiffs are entitled to almost no royalty.   The size of coal the market demands, and will alone accept, will doubtless determine the size which defendant will prepare and ship, but it cannot deprive the lessor of his right of contract payment; that must be determined by what the parties assented to at the date of the contract, and by their contract, and not by something unforeseen by either.   It is sufficient to say that, with a somewhat obscure agreement, and evidence vague at best to guide him, the master adopts that view which is most consonant with reason, and in no way conflicts with any of the terms of the written contract.   In so doing, he follows the suggestions in Navigation Co. v. Moore, 2 Wharton, 477, Dunham v. Haggerty, 110 Pa. 560, and Lance v. Coal Co., 163 Pa. 91.   We affirm his conclusion.

The master then finds that at the date of the contract the proportion of chestnut coal did not exceed fifteen per cent of the product of the mine, and that pea coal which then went into the dump equalled nine per cent of the product; that from February 1, 1873, the date of settlement between lessor and lessee, to August 21, 1893, there was prepared as chestnut coal, in excess of this fifteen per cent, 188,469 tons; and that, for every additional ton in excess of this percentage, there has been an excess of pea coal amounting to four tenths of a ton, or 75,378 tons. On this the master computes royalty; fifteen cents for excessive production of chestnut; for one half the excessive production of pea coal, which, but for the new method of preparation, would have been large sized coal, fifteen cents, and on the other half, which would have been chestnut, seven and one half cents. This last computation, afterwards, on exceptions, the master, sitting as judge, found to be error, and that the whole of the excess of pea coal, on the evidence, should be treated as what otherwise would have been larger size than chestnut, and therefore rated at fifteen cents per ton. As thus computed, the balance with interest due from defendant to plaintiffs, was determined to be, on August 21, 1893, $42,116.77.

Of the twenty-two assignments of error preferred by appellant, all except the thirteenth are to findings of fact and conclusions of law touching the master's interpretation of the contract. While we have considered them all, we are unable to sustain any one of them, except the thirteenth, and this we sustain only in part. In this assignment, it is claimed that the knowledge of the lessor's ancestor of the percentage of production of chestnut coal, and his receipt of the royalty prices, fixed the interpretation of the agreement, not only for himself, but for his descendants who now represent him in the contract. There is nothing in the evidence, in this particular, tending to show, that at that early date, there was any question as to the interpretation of the contract by either party. The coal business was, at the date of the accounts from the settlement in 1873 to 1881, in a very depressed condition. The returns during that period showed a production of chestnut coal running from 20 to 30 per cent, or 5 to 15 per cent above the average at the date of the contract. The lessor, on June 3, 1878, had received a return of coal mined, from Davis, sublessee of defend-

ant. It showed lump and prepared coal, 4,871½ tons, chestnut, 2,489 tons. Of this, the lessor, although the letter is not produced, evidently complained; for plaintiff's offer in evidence the reply of Davis, June 6, 1878, which to some extent discloses the grounds of the complaint: it says: "The coal mined at Warrior Run cannot be sold for iron purposes, nor for steam, and consequently has to be broken down into domestic sizes, and hard to sell at that. The return, instead of being as you say, in chestnut, more than half the product of the mine, is as follows: 7,360 tons, total amount mined, 2,489 tons chestnut, or about 30 per cent, which is the amount we are obliged to make in these times, and which is no greater than Lehigh Valley Coal Co., Swoyer and others are making outside of lump coal shipments. Now, Colonel, I appreciate your former generosity, and know your liberality," etc. This assumes that complaint had been made by Col. Wright, the lessor, that an undue quantity of chestnut coal was being produced; the lessee seeks to excuse it, because of an exigency. The lessor accepts payment, however, notwithstanding the excess of chestnut, at half the price of lump, and receipts in full. And so he continues to accept payment and receipt in full down to March 7, 1881. He died September 2, 1881. Clearly, he had full knowledge of the excessive production and protested against it, but, being appealed to by Davis, waived his right and receipted in full; and so, with each return up until his death. This was not an interpretation of the contract favorable to defendant; rather, it was directly the reverse. But, with full knowledge of his right, every receipt of money in full, on an account, embracing the excess, was a waiver of his right to insist on a strict interpretation of the contract in his favor. The payments may not have been in full of what was his due, but he chose to accept them, and his representatives cannot now go behind them. It was an act of generosity on the part of the lessor which he had the right to exercise. This is not the case of a false return accepted by the lessor, as in Dunham v. Haggerty, 110 Pa. 560; it is a correct statement of the fact, with an appeal to generosity for a reduction in price. And it does not follow that either his knowledge or generosity must be imputed to his representatives, so far as concerns payments made to them. There is no proof of knowledge on their part that the production of chestnut coal was in

excess of that within the meaning of the contract, nor any evidence of an exigency appealing to their generosity to prompt a waiver of their right.

We are of opinion, therefore, that computation of the excess, on the interpretation of the contract, as adopted by the learned master and judge of the court below, should be made only on returns dated from the last receipt of Hendrick B. Wright, next to, and immediately preceding his death. In all other particulars the master's very able and clear report is approved, and his decree as herein modified is affirmed. It is ordered that the record be remitted to the court below that computation be made as herein directed. Costs of this appeal to be paid in equal parts by appellant and appellees.

DISSENTING OPINION BY MR. JUSTICE MITCHELL:

I would reverse this judgment as making a new contract for the parties in the light of subsequent events, in place of the one they made for themselves.

I do not find any basis in the lease for the master's assumption that it contemplates "the breaking of the whole mine product into the different sizes of what was prepared coal in 1864, with their proportionate percentages to one another, by means of the methods and appliances in general use at that time." It is in the highest degree unjust and illogical to suppose that in an agreement made to extend certainly over ten years, and at the lessee's option for ninety-nine more, the latter cut themselves off from improved methods of mining, and bound themselves to the methods, appliances, and proportions of product, commonly used at that date. On the contrary the lease in my view gave the appellant the clear right to produce the different sizes of prepared coal without restriction as to the proportion of each to the whole. They were to pay the same royalty on all the sizes from the "lump" to "stove No. 4," but could produce as much or as little of each as in their judgment would be most profitable and, therefore, could reduce it all to "stove No. 4," the smallest prepared size on which the full royalty was payable. This is all that in fact they have done. The market calling for a larger proportion of the small sizes, they have passed the coal through the rollers twice. Incidentally in so doing they have made more of the chestnut size than before, but the production of chestnut

was always incidental, both at the time of the contract and now. If the demand for chestnut had ceased altogether, so that it became unsalable, appellant would nevertheless have had to pay for it, for they had taken that risk in their bargain and it would have been their loss. In fact the demand increased, and that is their legitimate profit. Of course if larger sizes, requiring full royalty, were intentionally reduced to chestnut they would still have to pay full royalty, for the contract does not contemplate the production of chestnut except as a necessary incident to the production of the stipulated " prepared " sizes. But no such evasion of royalty appears in the case. On the contrary the master finds explicitly that the additional quantity of chestnut is necessarily produced by the reduction of lump and steamboat to the smaller sizes, and that the process of double rolling is the least wasteful plan of reaching the desired result.

I do not understand the appellant's argument to claim, as the opinion of the Court states it, that they could prepare the coal " to any size which the defendant thinks may suit the market," but only to any of the stipulated sizes paying full royalty. The former claim, if made, is clearly too broad, but with the limitation to sizes paying full royalties, the claim not only avoids entirely the reductio ad absurdum of the court, but is the just and fair interpretation of the contract, and shows that the appellant was at all times within its legal rights, and has accounted fully for all of complainants' just demands.