## Hoyt *v.* Kingston Coal Company, Appellant.

*Mines and mining—Coal lease—Royalties—Change of sizes of coal—Coal for generating steam—Estoppel.*

While a lessee under a coal lease has the right under the contract to adopt new methods in the preparation of coal so as to meet the market demands for the smaller sizes of coal, such lessee must account and pay for the same proportionate part of the coal as the terms of the lease required under the methods of preparation in use at the time the lease was executed.

Where a coal lease stipulates for a royalty on all coal on the land that could be by skillful and careful mining, and without waste, mined and conveyed in mining cars to the breaker, and there passed over a five-eighths of one inch square mesh screen, the lessees are not entitled to a credit for so much coal as passed through the screen and was formerly abandoned as waste, and for coal contained in seams which were not worked at the date of the lease, but were subsequently operated.

Where a coal lease provides that the lessees shall pay a royalty of fifteen cents per ton "for all coal" mined and removed "which will pass over a screen the meshes of which are five-eighths of one inch square," and there is no authority in the lease to use royalty coal for the generation of steam, the lessees must account for coal used in operating the plant.

Where the lessors in a mining lease are paid minimum royalties and had no knowledge from accounts submitted to them or from other sources of the mining of any excess of royalty coal over the quantity paid for, they are not estopped from collecting royalties for coal mined and not accounted for.

Wright v. Warrior Run Coal Co., 182 Pa. 514, discussed, explained and followed.

MITCHELL, C. J., and POTTER, J., dissent.

Argued April 12, 1905. Appeal, No. 326, Jan. T., 1904, by defendant, from decree of C. P. Luzerne Co., March T., 1896, No. 2, on bill in equity in case of John D. Hoyt et al. v. The Kingston Coal Co. Before MITCHELL, C. J., BROWN, MESTREZAT, POTTER and ELKIN, JJ. Affirmed.

Bill in equity for an account of coal royalties. Before HALSEY, J.

The opinion of the Supreme Court states the facts.

*Errors assigned* were various findings quoted in the opinion of the Supreme Court, and the decree for an account.

*Henry W. Palmer* and *Samuel Dickson*, with them *A. L. Williams*, for appellant.

*Henry A. Fuller* and *George R. Bedford*, with them *Charles N. Loveland* and *John G. Johnson*, for appellees.

OPINION BY MR. JUSTICE MESTREZAT, May 22, 1905:

This was a bill filed by the plaintiffs to compel the defendant company to account and pay for coal mined and removed under the terms of a lease dated April 10, 1867, made by the ancestors of the plaintiffs with the defendant's assignors. By the terms of the lease, all the coal in and under certain tracts of land in Luzerne County were demised and let to the lessees for the consideration of a rental of fifteen cents for each ton of coal which would pass over a screen, the meshes of which were five-eighths of one inch square. A minimum annual rental of $4,500 was to be paid by the lessees for which they were entitled to mine and remove 30,000 tons. Mining operations were begun by the lessees soon after the execution of the lease and continued until 1883, when the lease was assigned to the defendant company, which has since continued the operations. The defendant, from time to time, made payments on the royalties but not in excess of the minimum annual sum required by the terms of the lease. This bill was filed to compel an accounting for a balance of royalties alleged to be due the plaintiffs. It is claimed by the plaintiffs that by the methods of preparing coal for the market since 1883 a much larger percentage of the mine product, brought to the surface in the cars, passes through the meshes of the screen than did so in 1867, the date of the execution of the lease, and that they are entitled to royalty on the difference in the quantity of coal passing through the meshes of the screen caused by the new method of preparation as part of the consideration for which the body of coal was sold. The learned trial judge states the position of the plaintiffs as follows: "The plaintiffs contend that by reason of the change in the machinery for the preparation of the coal to meet the changed condition of the market, that the consideration money to be paid to the lessors for the sale of the coal under and by virtue of the grant in the lease in proportion to the quantity of coal shipped has greatly diminished by reason of the fact that the methods introduced to meet the demands of the market have occasioned and required the introduction of machinery that

has caused a larger proportion of the contents of the mines to pass through the five-eighths of one inch square mesh than passed through as a result of the machinery in use at the time the lease was executed." In reply to this contention, the defendant company alleges as a full defense to the plaintiffs' claim, that the present methods of mining have resulted in producing more coal from the deposit in the veins than was obtained by the methods prevailing at the time of the execution of the lease; that at that time a large quantity of royalty coal was not removed from the mine but was thrown on the refuse pile; that then certain seams of coal were of such character as to be valueless when mined, but a change in the market has made them valuable and the plaintiffs get royalty on the coal from those seams; that royalty coal then used to generate steam on the premises is not now used for that purpose but is paid for by the defendant company.

The trial judge found that at the time of the execution of the lease by the methods and machinery employed in mining and preparing coal and known to the parties, a less proportion of the mine product passed through the meshes of the screen than passed through it from the time the defendant company began mining operations in 1883 till the filing of the bill; and " that the said excess of the proportion of the product of the mine passing through the said five-eighths of one inch square mesh has been occasioned by the change of the methods in the preparation of coal in the use of higher explosives in blasting it from the vein deposited in the mine, by the introduction of a greater number of rolls in the breaker than were used at the time of the execution of the lease as an effort on the part of the defendant to increase out of the product of the mine, the amount of smaller sizes to meet the changed demands of the market." He further found that by the methods employed in preparing coal at the execution of the lease .10655 per cent of the mine product passed through the meshes of the screen and that by the subsequent and present methods used in the preparation of the coal, .26522 per cent of the product passed through this screen. Against this difference of .15867 per cent of the loss caused to the plaintiffs by the different methods of preparation of the coal, the court credited the defendant with the bad coal reclaimed, amounting to, .0359 per

cent, " leaving a net loss to the plaintiffs since the introduction of the new methods over the old methods of .12277." The court ordered the defendant company to account to the plaintiffs for this amount of coal at the royalty price named in the lease.

In the disposition of the case, the learned trial judge followed the principles announced in Wright v. Warrior Run Coal Company, 182 Pa. 514. The defendant's counsel claim that " that case was decided on the peculiar language of the contract and upon the finding of fact by the master," and is not a precedent for the determination of the questions raised here. But in this we do not concur, and are clearly of the opinion that unless we overrule that case it is controlling here. In fact, the defendant's counsel practically concede that the Wright case rules this and ask us to overrule it by citing and quoting at length, in support of their contention, the dissenting opinion filed in that case. That was a bill for an account of royalties for pea and buckwheat coal, which are of smaller sizes than chestnut coal, shipped and sold, and for coal used at the mine for steam purposes. The contract fixed the royalty coal above the size of chestnut coal, and in the present case the royalty coal is all that passes over a screen with a five-eighths of one inch square mesh. There, there was a shifting scale of prices per ton with a minimum quarterly payment during the life of the lease, with a fixed price per ton if the term was extended. The earlier and later methods of preparing the coal were similar to those in this case. Just as here, some time after the mining operations commenced, the demand for the larger sizes of coal rapidly decreased, while the demand for chestnut, a smaller size on which a half royalty price was payable, greatly increased. To meet the new market demand, additional rollers were introduced which broke and rebroke the coal and largely increased the quantity of the smaller sizes of coal. One of the complaints in the bill was " that defendant, by changes in machinery and methods of preparing the coal for market, has largely increased the quantity of chestnut coal, for which the lower royalty is paid, and further, largely increased the quantity of pea and buckwheat coal, for which it denies its liability to pay any royalty." The bill prayed, inter alia, that defendant account for all coal rebroken for the purpose of increasing the

product of chestnut and smaller sizes.    There, as here, the defendant contends ".that the lease provides for breaking the coal, and that its very silence as to the extent it shall be broken, or the proportion of the sizes, leaves defendant free to adopt such methods for the future as will adapt the coal to the market demand, without thereby increasing its liability for royalty." The conclusion of the master, sustained by this court, was as follows : " In our opinion, the terms of the lease fairly contemplate.the breaking of the whole mine product into the different sizes of what was ' prepared coal ' in 1864, with their proportionate percentages to one another, by means of the methods and appliances in general use at that time and the manner then employed of operating such appliances, if the demands of the defendant's market for selling coal reasonably require the breaking and preparation of the product to that extent, and the operation be performed ' with as much economy and as little waste as may be ' ; and payment of royalty measured by this standard is all that the contract calls for.    To this extent we concur with the position of counsel for the defendant; but we find nothing in the terms of the lease which contemplates the breaking of this mine product to a greater extent than that already indicated, and while new conditions of the market for the sale of the defendant's coal in competition with other operators has justified it in adopting methods and machinery by which not only all the mine product has been broken to prepared sizes, but to the smaller of these sizes, whereby a great proportionate increase of chestnut and pea coal has occurred, these were not contemplated by the contract, and therefore the plaintiffs are entitled to payments of royalty upon the standard above indicated."

In the case in hand, the trial judge, in speaking of the consideration for the coal leased or sold and the lessees' right to adopt new methods of preparing coal, says : " The consideration money for the said sale must be governed by the amount of coal that would pass over a five-eighths inch square mesh by the methods used in its preparation at the date of the execution of the lease.    The lessees undoubtedly have the right to introduce new methods to meet the demands of the market in the preparation of the coal which would result in breaking up the coal to a greater extent than the methods that were in use

at the time of the execution of the lease, yet to the extent to which they thus diminish the amount of coal that would pass over the screen called for in the lease, they would be bound to pay the stipulated royalty per ton." It will be observed, therefore, that the court followed and enforced the rule announced in the Wright case, that while the defendant company had the right under the contract to adopt new methods in the preparation of coal so as to meet the market-demands for the smaller sizes of coal, yet it must account and pay for the same proportionate part of the coal as the terms of the lease required under the methods of preparation in use at the time the lease was executed.

As in the Wright case, the court below in this case held that the defendant is entitled, as against the plaintiffs' claim, to have a credit of so much coal as was redeemed by the new methods from bone and slate. But in addition to this, the defendant company contends that it should also be allowed a credit for so much coal as passed through the rake and was abandoned as waste in 1867, and for coal contained in certain seams which were not worked at the date of the lease, but are now operated by the company. But this contention overlooks the provisions of the lease that the "demised premises shall be worked in a careful and skillful manner . . . . and that no waste of coal shall be caused or permitted in mining, preparing and conveying the same away." It was a duty, therefore, imposed on the lessees by the contract that they should work all the leased coal carefully and skillfully to the extent at least of the minimum annual quantity fixed by the lease and permit no waste in mining or preparing it. The consideration to which the lessors were, and are entitled by the express stipulation of the contract, was a royalty on all coal in the land that could be, and was, by skillful and careful mining and without waste, mined and conveyed in mining cars to the breaker and would there pass over a five eighths of one inch square mesh screen. The methods of preparation used by and known to anthracite operators at the time the lease was executed must be presumed to have been in the contemplation of the parties when they executed the contract, and such coal as was produced by those methods furnished the basis of the lessors' consideration for the lease and must now and during the continuance of the

lease determine the quantity of coal on which royalty must be paid. If the lessees should leave coal in the mine which was marketable and would pass over the screen, it would be waste and a consequent violation of their contract. That it was at one time not marketable and was for that reason permitted to remain in the mine, will not excuse the lessees or their assignees in not conveying it to the breaker now, or, if passed over the screen, entitle them to a credit against the plaintiffs' demand. It would likewise be a violation of their contractual obligation were the lessees to fail to mine any seam of coal included in the lease which could be mined and removed by the customary methods of mining during the existence of the lease. They are not compelled to mine all of the veins at the same time. They are simply required to mine and remove the annual minimum quantity of coal, ascertained by passing it over the requisite sized screen, or pay the minimum royalty thereon during the term for which the lease was to run, as provided in that instrument. The fact, therefore, that certain seams were not being operated at the time of the execution of the lease does not entitle the defendant company to a credit for coal now being taken from those seams by the mining methods in use at this time.

Nor is there any merit in the defendant company's contention that it is entitled to a credit for the amount of royalty coal used for the generation of steam on the premises. It is true that in the Wright case the lessees were not required to pay royalty on the coal used under their boilers, but the master's conclusion was based on the terms of the lease in that case, and in affirming the correctness of that conclusion Mr. Justice DEAN, speaking for this court, says: "And this last conclusion (that lessees were not required to pay royalty on coal used under their boilers), the master shows, from the terms of the lease and invariable custom, to be a correct one." In the present case, however, the lease does not authorize the use of royalty coal for the generation of steam, or relieve the lessees from accounting for it. On the contrary, the lease distinctly provides that the lessees shall pay a royalty of fifteen cents per ton " for all coal " mined and removed " which will pass over a screen the meshes of which are five-eighths of one inch square." The lease in this case, therefore, not only does

not contemplate or provide that the lessees shall not pay for royalty coal used in generating steam in operating the plant, but explicitly requires them to pay for all the mine product which is carried to the breaker and passes over a screen having meshes of the designated size.

The fourth assignment alleges error in the court's conclusion that " the plaintiffs are not estopped by any acts on their part or by the acts of those for whom they act in a representative capacity, from now making this claim." This very question was raised in the Wright case and ruled against the position taken here by the defendant. There this court held that the lessor had waived his right to claim additional rentals because he had full knowledge of the excessive product of the smaller sizes of coal, and receipted in full when payments of royalties were made. But as to the lessor's representatives after his death, it was held that they had not waived their right to a recovery for such rentals because " there is proof of knowledge on their part that the production of chestnut coal was in excess of that within the meaning of the contract." Yet they had access to the premises and the lessees' books and receipted for the royalties when each installment was paid them. Here there was no account settled and the only payments made were for the minimum sum due under the lease, and the mining itself was less than the minimum tonnage. No receipts were given, and the evidence does not disclose knowledge of the mining of any excess of royalty coal over the quantity paid for. The plaintiffs are, therefore, not estopped from collecting royalties for coal mined and not accounted for.

The evidence justifies the finding of the trial judge as to the proportion of waste and the quantity of coal for which the defendant company should account to the plaintiffs. There is some confusion in the learned judge's findings of fact, but it does not affect the result at which he arrives. It arises partly from his not discriminating clearly between the methods of mining and the methods of preparation of the coal in determining the defendant company's liability to account. It is liable for any loss in the quantity of royalty coal resulting from the change of the methods of preparation.

The learned trial judge has correctly determined the rights

of the parties to this controversy under the facts of the case, and therefore the decree is affirmed.

MITCHELL, C. J., and POTTER, J., dissent.