Thomas et al., Appellants, *v.* Waters, Admr., et al.

Argued January 28, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Morton Meyers,* of *Graham, Yost & Meyers,* with him *Charles F. C. Arensberg,* of *Patterson, Crawford, Arensberg & Dunn, Ella Graubart* and *George M. Spence,* for appellants.

*Philip N. Shettig,* of *Shettig & Swope* and *Friedjoff D. Tappert,* with them *James H. Beal, Jr., Sherman T. Rock,* and *Reed, Smith, Shaw & McClay,* for appellees.

OPINION BY MR. JUSTICE LINN, March 24, 1941:

The plaintiffs are executors of William R. Thomas, who died April 4, 1932. The individual defendants are the administrator of the estate of John H. Waters, who died intestate August 14, 1933, and his widow and children, distributees at the final adjudication of his administrator's account. One of the corporate defendants, Hillcrest Foundation, Inc., is a corporation organized by the widow and children to facilitate distribution in kind; the other, G. C. Murphy Company, is a corpora-

tion, shares of which were pledged as collateral, and is a party only to prevent transfers of the stock pendente lite.

Plaintiffs' testator, William R. Thomas, was indebted to defendants' intestate, John H. Waters, on three collateral notes in the aggregate amount of $54,400, one a four-months note and the others payable on demand. The security was 1,655 shares of the Murphy common stock. The notes were in the usual form, authorizing the pledgee, on default, to sell at public or private sale without notice and with the right to purchase. Plaintiffs' bill was filed November 14, 1938, for an accounting and for the re-transfer of the collateral to them by the distributee-defendants. The theory of the bill is that the defendant distributees, who took in kind, received distributive interests in the obligations represented by the notes with corresponding interests in the collateral; that neither the pledgee, Waters, nor his distributees became the absolute owners of the collateral, the value of which is now much in excess of the debt, with the result that plaintiffs are entitled to have the debt paid out of the collateral and the excess delivered to them. The distributees had organized Hillcrest Foundation, Inc., and caused to be transferred to it, without consideration, as its records show, distributable assets, and then distributed those assets among the widow and children. The Murphy Company shares thus passed to the widow and children via the Hillcrest Foundation, Inc.

The defense was three-fold: (1) on the merits, that Thomas had defaulted, and that the pledgee Waters had become the absolute owner in 1931 under the power to buy at private sale; (2) want of jurisdiction in the common pleas and (3) laches.

The case was tried before the three judges of the court below, "sitting as chancellors," as the record states; they filed separate adjudications. President Judge McCann found as a fact that the pledgee, Waters, sold the col-

lateral to himself at private sale in 1931; he held that jurisdiction was in the Orphans' Court and not in the Common Pleas, and that the plaintiffs were barred by laches. Judge GREER declined to concur in the finding that a sale of the pledge took place, but agreed with Judge McCANN as to want of jurisdiction and laches. Judge McKENRICK found that there was no sale, that the court had jurisdiction, that there was no laches, and that the plaintiffs had shown themselves entitled to an account and decree permitting redemption of the pledged security. Exceptions to these adjudications were filed by plaintiffs, were heard by the court in banc and were disposed of in separate opinions. A decree dismissing the bill was entered, Judge McKENRICK dissenting. President Judge McCANN and Judge GREER agreed on the two legal propositions that there was no jurisdiction in the Common Pleas and that, in any view, plaintiffs' laches was a bar. The plaintiffs appealed. As only one of the three judges found that there was a sale of the pledge in 1931, and the other two judges declined to concur in that finding, we must lay it aside and treat the case as though it had not been made, because a finding of fact by a minority which a majority of the court declines to make, cannot sustain the decree: compare *Butts v. Armor,* 164 Pa. 73, 30 A. 357; *Myers v. Consumers' Coal Co.,* 212 Pa. 193, 200, 61 A. 825; *Ebling v. Schuylkill Haven Boro.,* 244 Pa. 505, 512, 91 A. 360; *Huntingdon County's Appeal,* 8 Pa. Superior Ct. 380, 391. The defendants have not appealed. It is therefore unnecessary to consider whether the evidence would support a finding that a private sale of the collateral was made in 1931.

Can the decree be sustained on either of the two grounds taken by the majority: want of jurisdiction, or laches? Some reference to evidence may aid in understanding the contentions of the parties as related to the two points on which we must pass. There is evidence that in 1931 the pledgor, Thomas, was in serious

financial difficulty. He owed banks and also Waters on collateral notes, with Murphy stock as security. It appears that a bank cashier sent the certificates for the Murphy shares pledged to the bank of which he was cashier and of which Waters was president, and also those pledged to Waters, to the transfer agent of the Murphy Company for transfer to the bank and to Waters, respectively, in order that the dividends might be sent to them instead of to the pledgor. There was testimony that Waters had not authorized the cashier to state to the transfer agent that the purpose of the transfer into Waters' name was to enable him to receive the dividends. A witness, at the time in the employ of a company of which Waters was president, testified, under objection, that Waters instructed her to make an entry of the Murphy stock in his "Investment Record"[1] and "handed me an envelope in which were notes, and he said it was a closed transaction and I should file the envelope in his compartment in the safe for posterity." At the time this was done, the market value of the shares was less than the amount owing on the notes; it was said, in argument, that the notes were retained because they were not fully paid, the suggestion being that if paid in full, they would have been returned to the maker. Consistent with that, is an averment in the answer that, after crediting the notes with $41,375, the market value at the time of the alleged sale, "The balance remaining unpaid on account of the indebtedness represented by the said notes, after applying such credit, was the sum of $15,535.40, which said amount still remains unpaid to the estate of John H. Waters, deceased, holder of

---

[1] "Q. Will you now kindly read that entry? A. Name of security, G. C. Murphy Company; description, common stock; denomination, or par value, no par; remarks, this stock transferred from William R. Thomas account, collateral; date 10/28/31, Nos. 2072 to 2087, inclusive, for 100 shares each, No. 03862 for 55 shares, making a total of 1655 shares. Q. Is the cost price shown? A. At the cost price of $54,400.00."

said notes." A witness for defendants testified that, as of January 1, 1934, he made a journal entry in a book that he had kept for decedent, Waters, stating "It now develops that these 1655 shares were fully transferred to John H. Waters on October 28, 1931 as full settlement of claims for loans amounting to $54,400." Who made the settlement, if it was made, does not appear. There is no evidence that Waters ever demanded payment of any deficiency, nor is there evidence, except of a trans-action between counsel for plaintiffs and counsel for defendants in 1935, to be referred to later in dealing with laches, that Thomas in his lifetime, or his execu-tors since his death, had notice prior to December, 1937, that Waters claimed the absolute ownership of the stock. Between the date of Waters' death in 1933 and November, 1935, the market price of the Murphy stock went up from about 25 to 133, a price much in excess of what would pay the Thomas obligations; by October, 1938, the market price was 180.[2] There is evidence that the inventory filed by the administrator of Waters "under the heading 'Notes' lists the following: William R. Thomas, Deceased, Value, August 14, 1933, $41,375.00, item No. 107 in the inventory" and that, in other books of account than those referred to above, the indebted-ness was carried at the total amount of the notes. Per-sonal Property Tax returns of Waters and the Waters estate for the years 1930 to 1933 inclusive were put in evidence; they showed no return of Murphy stock, which was exempt, but did show under the heading "Notes," William R. Thomas notes for each of the years 1930 and 1931, value $32,000, and for 1932 and 1933, value $41,375. A witness, who was state inheritance tax ap-praiser in 1935, testified that he made the appraisement for the purpose of assessing the inheritance tax, and appraised the notes at $41,375, and that he arrived at

---

[2] It was listed at $60, but in 1936 there had been a three for one division.

that figure by taking the market value of the collateral July 13, 1935. The appraisement appears to contain a footnote stating "Collateral of 1655 shares G. C. Murphy Co. stock was transferred to John H. Waters on account of these notes," a footnote which the appraiser testified "is purely to show how I arrived at the value." William R. Thomas, Jr., one of plaintiff-executors, testified that he discussed the matter with Robert S. Waters, Administrator of Waters, and said to him, "I hope the Waters Estate won't treat us like that" meaning that the collateral would not be sold, and the administrator replied, "We wouldn't do that." "We aren't selling." Mr. Waters denied making the statement. The evidence referred to, as well as other evidence on the same subject, gives some idea of the record and also shows the difficulty inherent in attempting to find whether there was a sale of the pledge in 1931. The burden of proving that fact was on defendants; it is sufficient now to say that they failed to satisfy the learned court below.

If the court had found that the pledgee had taken title at private sale, the property distributed at the adjudication must then have been regarded as the shares of the Murphy Company; on the other hand, if there was no sale, as we must take the fact to be, the property distributed at the adjudication was the obligation of Thomas together with the accompanying collateral subject to the right of redemption.

The first question for review is whether the majority of the learned court was right in dismissing the bill on the ground that exclusive jurisdiction was in the Orphans' Court. In his final account the administrator charged himself with the amount of the inventory and appraisement which, as has been stated, included under the heading "Notes" the Thomas notes, appraised at the then market value of the collateral. On the credit side of the account was a balancing item "To appraised value of securities transferred to Hillcrest Foundation, Inc.," which included the Thomas obligations secured by

the collateral. The final account was confirmed with distribution in kind. The pledgor's executors had succeeded (a) as debtors, to the debtor-creditor relation created by the notes and (b), as pledgors, to the pledgor-pledgee relation with the holder of the notes and the consequent right to redeem the collateral so long as the pledgee did not make his title absolute as permitted by the notes. The pledgee's administrator had succeeded to the right to collect the debt in a direct suit or out of the collateral, and not having exercised it, that right passed to his successors in title, the distributees.

In support of the view that there was no jurisdiction in the Common Pleas, it is contended that the Orphans' Court has exclusive jurisdiction of the administration of decedent's estates and that creditors must take notice of the administrator's advertisement to appear and present claims. Of that, there is no doubt; but the Thomas estate was not a creditor of the Waters estate in the sense that it held an obligation payable by Waters. If it had held such obligation and had not presented it for payment in due time in the Orphans' Court, that omission would, of course, have been the end of the claim: *Timmins's Estate,* 338 Pa. 475, 13 A. 2d 7. The Thomas estate had no standing to appear in the Orphans' Court and ask to get back its collateral without paying the debt which it was then unable to pay. If Thomas' executors examined the account filed for adjudication in the Orphans' Court, they discovered that the thing accounted for was the Thomas debt and that, apparently, it had been transferred to the Hillcrest Foundation for the purpose of making distribution in kind. The distribution discharged Waters' administrator (Fiduciaries' Act of 1917, P. L. 447, section 49 (b), 20 PS § 862), but it did not destroy the collateral notes and release the distributees from the obligation imposed on the holders by the secured notes. The distributees sharing in the debt took their shares subject to the right of redemption of the collateral;

they were volunteers and not purchasers *(Shannon v. Newton,* 132 Pa. 375, 382) and took only the pledgee's title which their intestate had. They took subject to the pledge just as a devisee of real estate subject to a mortgage takes subject to it unless the testator provides otherwise (Wills Act, 1917, P. L. 403, section 18, 20 PS § 242). The decree constituted the authority of the administrator to transfer the decedent's title to the debt; it therefore authorized delivery, which, having taken place, had the same legal effect as delivery of such a note by one holder to another; the decree of distribution was a step in passing the title; but, the title having passed, and the award satisfied, the exercise of jurisdiction by the Orphans' Court was ended, save for proceedings in review (under section 48 of the Fiduciaries' Act, 1917, P. L. 447, 20 PS § 843, or its equity power, *Huff's Estate,* 300 Pa. 64, 150 A. 98) on grounds not presented by this bill.

There is no challenge of the validity of the decree of distribution; the Orphans' Court made no finding that Waters had absolute and not a mere pledgee's title to the Murphy shares; the subject appeared, as has already been stated, in the inventory and the account and the agreements for distribution via Hillcrest Foundation, Inc.[3] The final account was balanced by an item "To Balance Distributed to Heirs." The distributees acknowledged receiving distribution and discharged the administrator from further liability June 10, 1937. As the inventory and the account dealt with secured notes and not with absolute ownership of the Murphy stock, reference may be made to *Connell's Estate,* 282 Pa. 555, 558, 128 A. 503, in which it was said: "Our

---

[3] An exhibit in evidence states that the Administrator claimed credit for securities "assigned, transferred and set over to Hillcrest Foundation, Inc., a corporation organized by the Heirs of said Decedent, viz: inter alia G. C. Murphy Company (appraised as William R. Thomas note for $54,400.00) common stock 1655, Appraised Value $41,375.00."

cases hold that the ownership of an alleged asset of an estate, not included in either inventory or account, and claimed by another, cannot be settled by the orphans' court, the jurisdiction of the court being limited to the instances where it has been expressly, or by necessary implication, conferred: *Cutler's Estate,* 225 Pa. 167. When property is formally claimed as belonging to the decedent, and to be a part of the estate, in either of the ways suggested, it may, however, pass on the question of title *(Crosetti's Est.,* 211 Pa. 490; *Williams' Est.,* 236 Pa. 259), with the right, in case of a substantial dispute, to certify the case to the common pleas for trial before a jury on the issue raised: *Walkinshaw's Est.,* 275 Pa. 121."

*Crisswell's Estate,* 334 Pa. 266, 5 A. 2d 577, on which appellees rely, is not in point. In that case the Orphans' Court restrained prosecution of an action in replevin on the ground that the property sought to be replevied had been in the possession of the decedent at the time of his death and was in the possession of the executor and was included in his inventory of decedent's property; the administration was not completed; the executors had not yet accounted; the question to be decided was who then had the right to possession. No dispute of that kind was presented in the Waters' Estate administration. The administrator had accounted, as has been said, for Thomas' obligation secured by collateral, which is what the parties took in kind. Nor do cases like *Walbridge's Estate,* 314 Pa. 250, 171 A. 580, aid appellees because that was a proceeding in the Orphans' Court by a creditor. As was said before, the Thomas Estate was not a creditor, it was a debtor to a decedent's estate; generally, the Orphans' Court has no jurisdiction over decedent's debtors: *Schnepf's Estate,* 48 Pa. Superior Ct. 580; *Szovak's Estate,* 51 Pa. Superior Ct. 7; *Hober's Estate,* 118 Pa. Superior Ct. 209, 180 A. 140. Not having paid the debt, it could not apply to the Orphans' Court, as was done in *Pax-*

*son's Estate,* 225 Pa. 204, 73 A. 1114, for the return of the property pledged.

There is no doubt of the jurisdiction of the common pleas to entertain a bill for an account and the redemption of collateral security *(Huntingdon Valley Trust Co. v. Norristown-Penn Trust Co.,* 329 Pa. 356, 196 A. 821) where, as here, the accounting is complicated.

While, in our review of the record, we must take the fact to be that Waters in his lifetime did not become the absolute owner of the Murphy shares, we must consider, in dealing with the defense of laches, the effect of the contention that defendants claimed ownership in circumstances which, they say, make it inequitable to entertain plaintiffs' bill.

In finding laches, President Judge McCANN dealt with the subject on the basis of his finding (in which his colleagues did not concur) that Waters became the absolute owner of the stock in 1931; that on November 7, 1935, the attorney for the executors of Thomas made written inquiry of the administrator of Waters concerning the status of the account, and was orally advised by counsel that Waters claimed absolute ownership. The question appears not to have been raised again until October 28, 1938, when present counsel for the Thomas executors informed defendant administrator they desired to pay the notes and redeem the collateral. This suit was brought November 14, 1938. In those circumstances the learned judge thought the action was too late. He said: "During that time [i. e., between October, 1931, and November, 1938] both parties to the collateral contracts had died, witnesses who could have testified to the facts surrounding the sale had also died, papers were lost or obliterated in the flood of 1936, the defendants had been left to take the chance of an adverse market and carry the risks of the investment for seven years. Then at the end of that period, when the stock had advanced in value to more than six times the value it had when taken over, the plaintiffs come

into court and suggest that they would like to pay the notes and take over the stock." Judge GREER did not discuss the subject, though he gave laches as one of the two reasons for joining in the dismissal of the bill.

It is obvious, from the references to the evidence made in this opinion, as well as from other evidence in the case, that Thomas, in his lifetime and his executors since his death, cannot on this appeal be considered to have known of the Waters' claim of absolute ownership until November 7, 1935, if then. The burden of proving the sale in 1931 was on defendants but they have failed to satisfy a majority of the court below. While the Thomas executors deny that they were advised of what their counsel, who has since died, learned, if anything, in 1935, they do admit that they learned of the claim in December, 1937, some months after the final distribution. In determining how long they may have known of it before bringing suit in November, 1938, we must subtract the period between October, 1931, and November 7, 1935, which Judge McCANN and, presumably, Judge GREER appear to have considered in finding laches; that period must be laid aside, because the appellants did not know of Waters' claim of title. By November, 1935, both Waters and Thomas were dead. It is said that, meanwhile, some books were destroyed by a flood, but the record shows that some records that were in the flood were available and were used; so far as appears, no essential document was missing. On the other hand there is evidence that plaintiffs' counsel died in January, 1937, and had to be succeeded by another; that plaintiffs were involved in other active litigation. The record will not support a finding that defendants were injured because the suit was not brought sooner, even if we should assume that plaintiffs, who deny knowledge of it, learned of defendants' claim in November, 1935. The application of the doctrine of laches is governed by a well-settled equitable principle: *Grange Nat. Bk. v. First Nat. Bk.*, 330 Pa. 1, 3, 198 A. 321;

*Barnes & Tucker Co. v. Bird Coal Co.,* 334 Pa. 324, 5 A. 2d 146. In applying the rule, and after taking out, as we must, the time between October, 1931, and November, 1935, we all think it inequitable, in the circumstances, to affirm the dismissal of the bill on the ground of laches. Compare *Slaymaker v. Wilson,* 1 P. & W. 216, 219; *Humphrey v. Bank,* 113 Pa. 417, 6 A. 155; *Reynolds v. Cridge,* 121 Pa. 189, 194, 18 A. 1010; *Hartranft's Estate,* 153 Pa. 530, 533, 26 A. 104.

The bill prays that the defendants, other than G. C. Murphy Company, account, etc., and turn over to plaintiffs, "all the stock of G. C. Murphy Company held as collateral security for the notes of William R. Thomas, and any additions or accretions thereto, on payment of the balance due on the obligations for which the stock was pledged." The record shows that Waters' administrator has made final distribution; a decree can therefore not be made against him in this case as administrator.

We have not dealt with assignments of error complaining of rulings on evidence and competency of witnesses for two reasons: (a) it was not necessary to do so in passing on jurisdiction and laches and (b) because we cannot anticipate the questions that may be raised at the trial.

The decree is reversed, the bill is re-instated, and the record is remitted for further proceedings consistent with this opinion, costs to abide the event.