## Troxell Estate

*Frank P. Slattery*, for petitioner.

*Floyd Vosburg* and *Mitchell Jenkins*, for respondent.

JONES, P. J., August 15, 1952.—On June 8, 1951, Blair Troxell, Sr., died, testate, survived by one daughter, Helen T. Gould, and two sons, Leroy Troxell and Blair Troxell, Jr.

Decedent's wife predeceased him in May 1947. Decedent then sold his home and since then lived periodically with his children at their several homes.[1]

On August 5, 1948, decedent, with his own money, opened a savings account in the Miners National Bank of Wilkes-Barre, Pa., in the name of "Blair Troxell, Sr. or Blair C. Troxell, Jr." This account was held as a joint tenancy with the right of survivorship, either party having the right to withdraw funds therefrom.

On July 15, 1950, decedent was placed in a "convalescent" home in Trucksville, Pa., and remained there until August 25, 1950.[2]

On August 25, 1950, Leroy Troxell removed decedent from the "convalescent" home to his own home where decedent remained until his death.

On August 8, 1950, decedent, with Leroy Troxell, went to the Miners National Bank of Wilkes-Barre and withdrew from the savings account $4,551, leaving a balance therein of $75.51. The Miners National Bank, in payment of the funds withdrawn, issued a cashier's check for $4,551 payable to the First National Bank of Dallas, Pa.

On August 9, 1950, Clara Troxell, the wife of Leroy Troxell, appeared at the Dallas Bank with the cashier's check and opened two accounts: a check account in the amount of $2,550 and a savings account in the amount of $2,000. Both accounts were opened in the names of "Blair Troxell, Sr., or J. Leroy Troxell." Signature cards for each account were handed to Clara Troxell by a bank employe.[3]

---

1. Decedent lived with each child for three-month periods, paying for his room and board $10 per week.

2. The placement of decedent in the "home" was by Helen T. Gould and Blair Troxell, Jr., Leroy Troxell being on vacation at the time.

3. Each of these signature cards provide, inter alia:

"It is agreed and understood that any and all sums that may,

Decedent never executed either signature card and the signature "Blair Troxell, Sr.," appearing on each card, was placed thereon, unwitnessed, by Clara Troxell, who claimed to have oral authority from decedent to sign any papers on his behalf. On or about August 16, 1950, the signature cards were returned to the bank by Clara Troxell, each card bearing the purported signatures of "J. Leroy Troxell" and "Blair Troxell, Sr." Whether the signatures of J. Leroy Troxell, admittedly genuine, were affixed to the cards in the bank or elsewhere is a matter of dispute.

Decedent never personally withdrew any money from either account, all withdrawals being restricted to the checking account and made by J. Leroy Troxell. Fifteen withdrawals were made from the check account. Nine of the withdrawals were by checks payable to "cash" totaling $1,627.80, and this money was deposited in a personal account of Leroy Troxell.

On May 25, 1951, when decedent was on his deathbed, Leroy Troxell withdrew the entire balance of $2,000 from the savings account and the entire balance of $1,050.45 from the check account and placed both amounts in a new account in the Dallas Bank in the name of "J. Leroy Troxell, Special Account," and said moneys were in this account when decedent died 14 days later.

The last will and testament of decedent was in the possession of J. Leroy Troxell at the time of decedent's death.[4] Without probating decedent's will, Leroy

from time to time, stand on this account to the credit of the undersigned, depositors, shall be taken and deemed to belong to them as joint tenants and not as tenants in common; *while both joint tenants are living, either may draw* and in case of the death of either, this Bank is hereby authorized and directed to deal with the survivor as sole and absolute owner thereof."

4. This will provided for an equal distribution of the balance of testator's estate between his three children and named J. Leroy Troxell and Blair Troxell, Jr., as executors.

Troxell took upon himself the payment of certain obligations of decedent and then rendered to his brother and sister a schedule setting forth the assets of decedent's estate, together with certain credits claimed by him. Among the assets of the estate was listed "Leroy Troxell account in Dallas Bank — $4,958." Leroy Troxell claimed credits totaling $3,936 for such items, inter alia, as cigars, shaves, haircuts for decedent, legal fees and a board bill allegedly owing by decedent to him of $2,050.[5] This schedule provided for a three-way distribution among the children of the balance in decedent's estate.

Sometime later Leroy Troxell renounced his right to letters testamentary and turned the will over to his brother, Blair Troxell, Jr., who probated the will on January 25, 1952.

On February 27, 1952, Blair Troxell, Jr., as executor of decedent's estate, presented to this court a petition for a citation directed to Leroy Troxell to show cause why he should not produce the assets of decedent's estate, particularly the moneys in the bank, and turn them over to the executor for administration. A citation was issued and directed to Leroy Troxell in accordance with the prayer of this petition.

On March 10, 1952, Leroy Troxell filed an answer averring that he did not have in his possession any assets of the decedent's estate and averring that the balance of $75.51 in the Miners National Bank of Wilkes-Barre constituted the entirety of decedent's estate.

On this petition and answer, hearings were held and testimony taken.

---

5. It is interesting to note that during the course of the hearings, Leroy Troxell submitted an amended statement of credits claimed reducing the amount to $1,864.99, of which the board bill was $1,365.

Leroy Troxell claims that the $4,551 withdrawn from the Miners National Bank account was given to him by decedent on August 8, 1950.

Two questions arise on this petition and answer: (1) Does the orphans' court have jurisdiction of the subject matter of this dispute, and (2) if the orphans' court does have jurisdiction, is the dispute of such a substantial nature as to make mandatory a trial thereof by jury?

All parties concede that, if this court has jurisdiction of the subject matter of the dispute, the dispute is so substantial in nature as to make mandatory a trial of the issues by jury.

The jurisdiction of this court is determined by section 301(13) of the Orphans' Court Act of August 10, 1951, P. L. 1163, which provides as follows:

"The Orphans' Court shall have exclusive jurisdiction of:

"Title to Personal Property. The adjudication of the title to personal property in the possession of the personal representative, or registered in the name of the decedent or his nominee, or alleged by the personal representative to have been in the possession of the decedent at the time of his death."[6]

Prior to the Orphans' Court Act of 1951, jurisdiction of the orphans' court to adjudicate the title to personalty depended on whether the personalty was, actually or presumptively, in decedent's possession at the time of death, or thereafter came into the posses-

6. It is fundamental that jurisdiction cannot be conferred by consent. The orphans' court, a court of limited jurisdiction, can exercise only such power as is given it by statute, either expressly or by necessary implication:

Schroeder Estate, 352 Pa. 170 (1945); Thomas et al. v. Waters, Admr., et al., 342 Pa. 125 (1941); Mauser et al. v. Mauser et ux., 326 Pa. 257 (1937); Mains' Estate, 322 Pa. 243 (1936); Wolfe v. Lewisburg Trust Co., 305 Pa. 583 (1932); Cutler's Estate, 225 Pa. 167 (1909); Lucabaugh Estate, 74 D. & C. 68 (1909); Hunter, Orphans' Court Commonplace Book, vol. 2, p. 960.

sion of his personal representative: In re Starz' Estate, 353 Pa. 612 (1940); DiPaola Estate, 350 Pa. 408 (1944); Brown's Estate, 343 Pa. 230 (1941); Criswell's Estate, 334 Pa. 266 (1939); Keyser's Estate, 329 Pa. 514 (1938); McGovern's Estate, 322 Pa. 379 (1936); Williams' Estate, 236 Pa. 259, 264, 271 (1912); Cutler's Estate, 225 Pa. 167; Balock Estate, 151 Pa. Superior Ct. 592 (1943); Hoak v. Unger et al., 143 Pa. Superior Ct. 389 (1940); Smith's Estate, 141 Pa. Superior Ct. 571 (1940); Adams' Estate, 139 Pa. Superior Ct. 512 (1939); Gallagher Estate, 109 Pa. Superior Ct. 304 (1933); Smith v. Philadelphia Fidelity Trust Co. et al., 61 D. & C. 317 (1947); Troutman v. Seiler, 59 D. & C. 132 (1946); 7 Pitts. L. Rev. 163; 47 Dickinson L. Rev. 1.

The Orphans' Court Act of 1951, supra, was "intended to obviate, whenever possible, a preliminary dispute as to whether the Orphans' Court has jurisdiction to determine the title to the disputed property."[7]

The Orphans' Court Act of 1951, supra, considerably broadens the scope of the court's jurisdiction and the orphans' court now has exclusive jurisdiction to determine the title to personalty where the following situations exist:

1. If the personalty was in decedent's possession, actually or presumptively, at the time of death;

2. If the personalty came into the possession of decedent's personal representative subsequent to death;

3. If neither 1, nor 2, exist, but if the personalty was "registered"[8] in the name of decedent or his nominee;

---

7. Explanatory Comment to sec. 301(13) from the Report of the Joint State Government Commission of the General Assembly of Pennsylvania.

8. The word "registered" when used in a statute is used as a synonym for "to record formally and exactly," "to enter precisely"

4. If there is an allegation[8] by the personal representative that the personalty was in possession of decedent when he died.

An analysis of the testimony will indicate that:

1. The bank account was not in the *actual* possession of decedent at his death;

2. The bank account did not come into the possession of decedent's personal representative subsequent to death.[9]

3. The bank account was not registered in the name of decedent at death.

This leaves for determination under the testimony the following questions:

1. Was the bank account in the *presumptive* possession of decedent at death?

2. Was the bank account registered in the, name of a "nominee" of decedent at death?

3. Does the personal representative allege that the bank account was in decedent's possession at death?

If the answers to all these questions are in the negative, then this court does not have jurisdiction. If the answers to any one of these questions is in the affirmative, then this court does have jurisdiction.

The possession of personalty by a decedent at time of death, as a requisite to the attachment of the jurisdiction of this court, may be either actual or presumptive possession: Moyer's Estate, 341 Pa. 402 (1941); Crisswell's Estate, supra; Keyser's Estate, supra.

---

or "to enter formally on a record": Words and Phrases, vol. 36, pp. 648, 651. The use of the word "alleged" in a statute is synonymous with the words "charged," "stated," "claimed" or "declared": Words and Phrases, vol. 3, pp. 224-26. The distinction between things *alleged* and things *proven* is clear.

9. Leroy Troxell, although named as a "personal representative" in decedent's will, renounced his right to letters testamentary and, therefore, cannot be said to have been in possession as a "personal representative."

Whether the personalty was presumptively within a decedent's possession when he died is a jurisdictional fact within the power of the court to determine; Moyer's Estate,[10] supra; Cutler's Estate, supra.

Up until May 25, 1951, the Dallas Bank account, in the names of decedent and respondent, was in the presumptive possession of decedent and had decedent then died this court would clearly have had jurisdiction in this matter: Fell Estate, supra; Brown's Estate, 343 Pa. 230, 236 (1941); Moyer's Estate, supra. Cf. Smith Estate, supra. However, that bank account was closed out on May 25, 1951, and when decedent died 14 days later the money had been transferred to an account in respondent's name alone. Admittedly, the funds were originally decedent's and respondent's right to take unto himself these funds could arise only from either of two sources, either as donee of a gift inter vivos or as a party to the contracts evidenced by the signature cards. Respondent's right in either respect is substantially disputed. Whether respondent's possession of the account was in his own right or in a representative capacity involves a resolution of conflicting testimony. Our jurisdiction itself depends on a resolution of these facts. It is our duty in limine to resolve this dispute and for the determination of the factual dispute as to whether or not decedent had presumptive possession of this account on June 8, 1951,

---

10. In Moyer's Estate, supra, a bank issued to Moyer a certificate of deposit. Several weeks prior to death, Moyer gave Y a power of attorney to act for him generally. Subsequent thereto, the certificate which had been in the possession of B was turned over to Y but it remained unendorsed in Y's possession when Moyer died. Y claimed the certificate by a gift causa mortis, and produced oral evidence in support of the gift. The estate claimed no gift had taken place and that Moyer's mental and physical condition precluded such a gift. The court held that the certificate presumptively was in decedent's possession, hence, the orphans' court had jurisdiction.

a jury is the proper tribunal: Welch's Estate, 32 D. & C. 231, 238 (1938).

The provision in the Orphans' Court Act of 1951 that the orphans' court jurisdiction may attach where the personalty is registered in the name of decedent, or his nominee, is a new provision in our law.[11]

Can Leroy Troxell, in whose name the account[12] was registered when decedent died, be considered a "nominee"[13] of decedent within the provisions of the Orphans' Court Act of 1951, supra? Respondent takes the position that on August 8, 1950, he became the absolute owner of the moneys withdrawn from the Miners National Bank of Wilkes-Barre and that decedent on that date made a gift inter vivos of such money to him. The estate takes the position that decedent did not make a gift inter vivos to respondent and that from August 8, 1950, to the date of decedent's death

---

11. Fell Estate, supra, held that the orphans' court had jurisdiction to determine a dispute concerning the title to a bank account in the name of decedent and another at the time of decedent's death on the ground that the account was possessed, actually or presumptively, by decedent when he died.

12. When a deposit was made in the Dallas Bank, the money so deposited ceased to be the money of the depositor. Between the bank and the depositor there was simply a debt or a chose of action. While we talk of ownership and possession of the bank account, strictly speaking it is ownership, or possession of the debt or chose in action: Smith's Estate, supra; Hober's Estate, 118 Pa. Superior Ct. 209 (1935); First National Bank of Newcastle, 95 Pa. Superior Ct. 199, 202 (1929); Michie, Banks and Banking, vol. 5A, §1; Zollman, Banks and Banking, vol. 5, §3153.

13. Words shall be construed according to their common and approved usage: Article III, sec. 33, Statutory Construction Act of 1937; In re Commonwealth Trust Co. of Pittsburgh, 357 Pa. 349 (1947).

The word "nominee" ordinarily indicates one designated to act for another as his representative. Vol. 28, "Words and Phrases," 706; Schuh Trading Co. at el. v. Commissioner of Internal Revenue, 95 F. 2d 404, 411; B. F. Avery & Sons Co. v. Glenn, 16 F. Supp. 544, 547, 548; Cisco v. Van Lew, 141 P. 2d 433, 438.

respondent acted solely in a representative capacity for decedent in the handling and disposition of this money. The determination of this question is a determination of fact, not of law, and the facts are seriously and substantially in dispute.[14]

If Leroy Troxell held this account as owner, then we have no jurisdiction in this matter; if he held this account in a representative capacity then the converse is true. The questions of the ultimate jurisdiction of this court as well as the title to this account are so intricately interwoven that to determine the one decides the other.

Former Justice Ladner, while on the Orphans' Court of Philadelphia County, in Welch's Estate, supra, stated (p. 238):

". . . Where there arises a substantial dispute of a fact or facts upon which the question of the jurisdiction of this Court depends, an issue becomes a matter of right but where all the facts upon which the question of jurisdiction depends are not in dispute,

---

14. To illustrate: Respondent testified he was given this money by decedent on August 8, 1950. If there was a gift inter vivos by decedent to respondent then, why was the Dallas Bank account opened on August 9, 1950, in the name of decedent and respondent? Why did respondent's wife request authority from decedent to execute signature cards concerning an account in which moneys allegedly of respondent alone were placed? Why did respondent and his counsel deem it necessary to withdraw all the funds from the joint account on May 25, 1951, at a time when decedent was on his deathbed? Why did respondent, subsequent to decedent's death, include in his so-called schedule—prepared by him after consultation with his counsel—the bank account as an asset of decedent's estate? Why did decedent—shortly before death and while on his deathbed—according to the testimony of respondent's son—find it necessary to indicate he wanted the money given not to respondent but to respondent and his family? Why did respondent withdraw approximately $1,600 from the joint account and place it in his own personal account?

the question becomes one of law, solely, to be decided *in limine. . . ."*

We believe that a prima facie case of jurisdiction has been established but since our ultimate finding of jurisdiction depends on a resolution of seriously controverted facts we believe we are justified in submitting such facts to a jury for its determination. A determination of these facts will solve not only the ultimate problem of this court's jurisdiction but also title to the bank account.

In view of this conclusion it is unnecessary for us to determine whether there is a sufficient allegation by the personal representative of decedent's possession of the bank account to enable this court to entertain jurisdiction on that ground.

We believe that the legislature, in an attempt to finally fix jurisdiction in the majority of these disputes in the orphans' court and to curtail the much litigated question of jurisdiction, intended that a mere allegation by the personal representative that decedent was in possession at the time of his death suffices to attach the jurisdiction of the orphans' court.[15]

In view of our opinion that there is a dispute of facts upon which our ultimate finding of jurisdiction may depend, and that such facts must be resolved by a jury, it is evident that the determination of this question will determine not only the court's jurisdic-

---

15. (a) If the legislature meant "proof" instead of an allegation it should have so stated because the courts are bound to construe the words in a statute according to their common and approved usage.

(b) Query: If there is no allegation by the personal representative that decedent at time of death was in possession, should testimony be taken by the court? If testimony is taken and the testimony indicates that decedent, neither actually nor presumptively, was in possession when he died, then must not the court follow the proof rather than the allegation in determining jurisdiction?

164

tion, but also the ownership of the bank account; that such a result will follow is not a deterrent to our judgment in this matter. Counsel concede that there is a substantial dispute on the facts as to the title to this bank account and have demanded a trial by jury. The decision of the jury will resolve what now appears to be a prima facie case of jurisdiction as well as the title to the bank account.

After consultation with counsel for the respective parties and in line with the views expressed in this opinion, this court will frame the appropriate issue or issues for submission to a jury.