## Myers, Appellant, *v.* Consumers' Coal Company.

*Mines and mining—Royalties—Change of methods—Accounting—Lease.*

Where on a bill in equity for an accounting of royalties under a coal lease, it appears that by a change in the machinery and methods of preparing coal used at the time of the lease and for some years thereafter, the amount of larger royalty coal was greatly diminished and the amount of waste and smaller sizes of coal, paying a lower rental, was largely increased, it is imperative upon the court below to find as a fact the proportion of the mine product which was royalty coal under the former as well as the later methods of preparing the coal. Absence of such finding is ground for reversing the decree. The evidence taken in the case and the decision in Wright v. Warrior Run Coal Company, 182 Pa. 514, establish that such a finding is possible.

MITCHELL, C. J., and POTTER, J., dissent.

Argued April 10, 1905. Appeal, No. 122, Jan. T., 1904, by plaintiffs, from decree of C. P. Luzerne Co., March T., 1900, No. 2, on bill in equity in case of E. Oscar Myers et al. v. The Consumers' Coal Company et al. Before MITCHELL, C. J., FELL, MESTREZAT, POTTER and ELKIN, JJ. Reversed.

Bill in equity for an accounting of coal royalties.
The opinion of the Supreme Court states the case.

*Error assigned* among others was (3) in finding that at the date of the lease there was no customary standard of proportion

governing production of the various sizes, but that such proportion depended upon the will of a particular operator with reference to his particular market from time to time.

*Alexander Farnham* and *Edmund W. Burke*, with them *Henry A. Fuller* and *George R. Bedford*, for appellants, cited: Wright v. Warrior Run Coal Company, 182 Pa. 514.

*Henry W. Palmer* and *Samuel Dickson*, with them *Felix Ansart*, for appellees.

OPINION BY MR. JUSTICE MESTREZAT, May 22, 1905 :

The rulings of the learned trial judge on the controlling questions in this case are at variance with the decisions of this court and cannot be sustained, and therefore the decree entered by him must be reversed.

Wright v. Warrior Run Coal Company, 182 Pa. 514, was a bill filed in the court of common pleas of Luzerne County for an accounting of royalties which the plaintiffs alleged were due them from the defendant company on an anthracite coal lease. The lease was dated November 28, 1864, was for ten years with the right of extension, and the consideration was a shifting price per ton, from fifteen cents to ten cents, and a minimum quarterly payment of $1,250. Chestnut coal was to be one-half price. The defendant company accounted and paid for all the coal mined and removed under the lease except pea and buckwheat, smaller sizes than chestnut, and coal burned under the boilers on the premises. The bill was filed against the company to compel it to pay for the pea and buckwheat and coal used under the boilers. The bill averred, inter alia, " that defendant by changes in machinery and methods of preparing the coal for market, has largely increased the quantity of chestnut coal, for which the lower royalty is paid, and further, largely increased the quantity of pea and buckwheat coal, for which it denies its liability to pay any royalty." One of the prayers of the bill was " that defendant account for all coal rebroken for the purpose of increasing the product of chestnut and smaller sizes." This averment and prayer raised the principal contention in the case. The case was most carefully and ably considered in the common pleas of Luzerne county. It

was found that at the time of the lease there were seven sizes of coal produced in the anthracite coal region, and that the production of chestnut coal (the smallest size) was at that time about fifteen per cent of the output of the mine, and that subsequently the two largest sizes ceased to be marketable and the lessee was compelled to break these kinds into smaller sizes. Later, two new kinds of coal, known as pea and buckwheat, both smaller than chestnut, had a market value, although at the date of the lease they went into the culm bank as worthless. The lessee largely increased the production of chestnut coal and sold large quantities of pea and buckwheat, the production of which was largely increased and upon which he refused to pay royalties. It was held that the lessors were entitled to royalties upon all chestnut, pea and buckwheat coal in excess of fifteen per cent of the product of the mine. While this was the principal question in the case, the court also determined that, under the facts there presented, the lessors' representatives by accepting the royalties paid by the lessees had not waived their right to recover the full royalty price for the chestnut and smaller sizes of coal in excess of the fifteen per cent of the mine product, for the reason that " there is no proof of knowledge on their part that the production of chestnut coal was in excess of that within the meaning of the contract." It was also held that " by the terms of the lease and invariable custom," the parties to the contract did not contemplate any per ton royalty for coal that might be used under the lessees' boilers.

Hoÿt v. Kingston Coal Co., 203 Pa. 509, was a bill filed in the common pleas of Luzerne county for an accounting for coal mined and removed by the lessee under an anthracite coal lease, dated April 10, 1867. The plaintiffs' claim was for royalties on the excess of coal caused to pass through a screen by a change in the methods of preparation over the amount of coal passing through the screen by the methods in vogue at the date of the lease. The decree first entered was in favor of the plaintiffs, but on appeal it was vacated and the record remitted to the trial court that requests for findings of fact and law might be answered as required by the equity rules. The case has been reheard by the court below, and a decree entered again in favor of the plaintiffs has been affirmed in an opinion

handed down herewith.    We hold that, in the disposition of
the questions arising in the case, the trial court followed the
rulings in Wright v. Warrior Run Coal Company, 182 Pa. 514.
The term in the Hoyt case was for twenty years with the right
of extension.    The rental was fifteen cents for each ton of coal
which would pass over a screen the meshes of which were five-
eighths of one inch square, the lessee to pay a minimum yearly
rental of $4,500.    The lease provided that the premises should
be worked in a careful and skillful manner without waste.
The case was first heard by the late president judge of the
common pleas of Luzerne county (WOODWARD) and he entered
a decree for an accounting.    The rehearing of the case was be-
fore Judge HALSEY, who found that by the methods used in
the preparation of coal at the time of the lease, a percentage
of .10655 of all the mine product passed through the screen of
five-eighths inch meshes; and that by the present methods the
percentage is .26522, and that therefore there was a percentage
of .15867 of the former royalty coal now passing through the
screen.    He allowed a credit against this of .0359 for bad coal
reclaimed, and entered a decree that the defendant account to
the plaintiffs for .12277 of all the coal mined at the rate of fifteen
cents per ton.    At both trials the defendant unsuccessfully
claimed a credit against the excess of production of royalty
coal for coal now screened and sold but under former methods
permitted to remain in the mine, and also for coal now mined
and marketed from certain seams which, at the time of the
lease, was of such character as to be valueless.    In passing
upon the right of the defendant company to a credit for this
coal, Judge HALSEY in his opinion says : " The coal that was
thrown into the gob which passed through the rakes and which
subsequently was loaded into the mine car and passed over the
five-eighths inch square mesh for which the plaintiffs were paid
royalty, was coal that in part constituted the consideration for
which the sale under the indenture of lease was made.    Until
it was taken from the mine and passed over the five-eighths
inch square mesh, it could not be used in liquidation of the con-
sideration for the grant under the indenture of lease.    To the
same effect is the coal contained in the veins which were not
worked at the time of the execution of the lease.    The coal in
the veins was the consideration for the payment of the grant

to the lessees under the terms of the indenture of lease and could not operate in a discharge of the obligation of the consideration until it was moved from the mines and passed over the five-eighths inch square mesh and sent to market.    We cannot see how the defendant can be entitled as against the claim of the plaintiffs to have the coal that now is taken from the mines which formerly went into the gob and which has now been determined royalty coal and that which has been taken from the veins which were not worked at the time of the execution of the lease as an offset against the plaintiffs' claim. All the coal in the mine which would pass over a five-eighths inch square mesh was the consideration which moved the grantors in the indenture of lease to execute it on April 10, 1867."    It was held against the contention of the defendant company that under the terms of that lease the company was not entitled to a credit for royalty coal formerly used for generating steam on the premises, and that the plaintiffs' acts and conduct did not estop them from making the claim for the unpaid royalties.

The present case was a bill filed also in the common pleas of Luzerne county for an accounting for royalties alleged to be due under a lease of anthracite coal in that county, dated January 26, 1863, and for the termination of the lease by reason of the nonpayment of rentals.    The lease demised all the coal under certain tracts of land in Luzerne county for a term of twenty years and for such other time as the lessee should continue to pay the rent stipulated in the instrument.    The lessee was to pay an annual rental of $5,000 in quarterly installments, for which he was permitted to " mine and remove coal of the sizes below named(and larger than No. 5 coal) as those for which rent is payable, to the amount of 50,000 tons . . . . and for all coal mined and removed prior to the first day of April, 1864, or in any one year, over and above the said 50,000 tons shall pay the rent of ten cents per ton for every ton . . . . of the size which will correspond with sizes known as numbers one, two, three and four, numbers three and four being stove coal, and for all larger sizes ; and, for all such coal mined and removed as aforesaid, of the size known as number five, the sum of five cents per ton ; but no charge shall be made for any coal smaller than number five coal ; except that the party of the

first part, the party of the second part and the party of the third part shall, each party, be entitled, for home use, to an amount of number five coal not exceeding fifty tons per annum; for which, no rent shall be charged."

The principal and most important claim for an accounting in this case is the same as the one presented and allowed in the two cases cited above, viz.: that by a change in the machinery and methods of preparing coal used at the time of the lease and for some years thereafter, the amount of larger royalty coal was greatly diminished and the amount of waste and smaller sizes of coal, paying a lower rental, was largely increased, and that the lessor is entitled to an accounting for the same percentage of higher royalty coal as was produced by the methods of preparation in use at the date of the lease. The lessee in this case, as in those referred to, claims a credit on the royalty coal for coal on which, under the former methods of mining and conveying to the breaker, the lessor received no royalty and which is now screened and accounted for. The lessors, however, contend that the gain from this source, being disconnected with the methods of preparation in the breaker, cannot be considered against the loss resulting from those methods. It is, therefore, apparent that it was vitally important that the trial court should ascertain, as was done by the same court in similar cases, the proportion of the mine product which was chestnut and other royalty coal under the former as well as the later methods of preparing the coal. Upon this branch of the case, the learned judge (FERRIS) of the court below found as follows: " We are unable to conclude from the evidence that, at and before the date of this lease, the quantity of chestnut coal marketed in the region bore any fixed or recognized proportion to that of other sizes. . . . At the date of the lease there was no customary standard of proportion governing the production of the various sizes, but that such proportion depended upon the will of the particular operator with reference to his particular market from time to time." The learned judge recognizing the importance of this finding and apparently its conflict with the decision of his own court, affirmed by this court, says: " As this finding is one of great if not controlling importance as bearing upon the question whether the preparation of coal according to the modern instead of the

old method has been hurtful to the lessors, we have given to it the most careful consideration—the more so as we were under the impression that the learned master and judge in Wright v. Warrior Run Coal Company, 182 Pa. 514, had arrived at a different conclusion, viz. : that at this time the customary production of chestnut was about fifteen per cent of the output of the mine."

We agree with the learned judge that his finding of fact on this question " is of great if not controlling importance " in the determination of the issues involved in this case. Without a finding on this question in favor of the plaintiffs, the basis of their claim is gone and their right to an account must be denied. But we are clearly of opinion that his finding cannot be sustained and that it is not only contrary to the evidence but to former adjudications of the learned judge's own court which have been affirmed by this court. His finding is in direct conflict with the finding of his own court in the Wright case. There, after a most careful consideration of a large amount of testimony on the subject, the late Judge BENNETT, acting as master and subsequently as judge of the court, found that " under the system of rollers and appliances for breaking and preparing coal at that time—even when all the lump and steamboat sizes were passed through the rollers —the total production of chestnut did not exceed fifteen per cent of the product of the mine, including in such product not only the chestnut and sizes above that, but also still smaller coal, equivalent to nine per cent of the mine product which went to the dirt bank in sizes that later came into use as pea coal." This court approved the finding and the master's other findings relative to the methods of preparation of coal in the anthracite region at the date of the lease involved in that litigation.

In Hoyt v. Kingston Coal Company, 203 Pa. 509, the lease was similar to the lease in this case and the accounting was asked for on substantially the same grounds as here. A great deal of testimony was taken before Judge HALSEY. The leading counsel for the plaintiff there was also of counsel for plaintiffs here, and one of the counsel who represents the defendants here represented the defendant there and insisted " that there is no testimony in the case to show

with any degree of accuracy how much coal went through
the five-eighths mesh in the earlier years neither is there
any testimony from which the fact can be accurately ascer-
tained how much more coal went through the five-eighths mesh
in the later years." Judge HALSEY, however, found without
any apparent difficulty " the customary standard of proportion
governing the production of the various sizes " of coal by the
methods used in the preparation of coal at the date of the lease
in April, 1867, and decreed an accounting for a certain per-
centage of the mine product during the operation of the mine
by the defendant company. The testimony introduced in this
and other cases referred to is of the same general character and
amply sufficient to warrant a finding as to the proportionate
quantity of the different sizes of coal produced by the former
and present methods of preparation. In view of this fact and
of the decisions of his own court on coal leases of this charac-
ter, all executed within a few years of each other, and the ap-
proval by this court of those decisions, we are compelled to
sustain the third assignment of error and reverse Judge FER-
RIS' finding and decree.

It will certainly appear anomalous that there should be two
appeals heard by this court at the same term from two conflict-
ing decisions of the same court on the same question. On an
examination of the records of the two cases (this case and the
Hoyt case), it will be seen, however, that the decrees appealed
from were not entered by the court but by two different judges
of the court. Of course, there is no authority for such a pro-
ceeding. Appellate courts hear and determine appeals from
the judgments and decrees of inferior courts, not from the judg-
ments and decrees of a judge of those courts, unless jurisdic-
tion is specially conferred. Luzerne county is a separate judi-
cial district and elects four judges learned in the law who sit
in and compose the court of common pleas of that county.
While there are four law judges of the common pleas of that
county, there is but one court and the concurrence of a majority
of the judges is a prerequisite to the entering of a valid de-
cree. When exceptions were filed to the findings of the judge
who heard this cause, the court in banc should have heard the
argument on the exceptions and, after consideration, should
have disposed of the exceptions and entered a decree. There

would then have been a decree of the court from which only an appeal lies. In view of the former rulings of the common pleas of Luzerne county and of this court on the questions involved in this appeal, it is not at all probable that there would have been the apparent inconsistency of two conflicting decrees entered in the same court on similar testimony in two different actions. As neither party has raised any objection to the course of procedure, we have considered the cause as heard by the court and the decree as entered by it. But as the ascertainment of the percentage of the quantity of royalty coal produced by the earlier and later methods of preparation, the important question in this case, requires the examination and consideration of over 1,500 pages of testimony, we will not, in reversing the trial judge on this finding, perform this task, but let the court below ascertain the fact which can be reviewed on exceptions by the court in banc and subsequently here, if desired.

What has been said indicates the principles, announced in our decisions, on which this case should be tried and shows that some at least of the several assignments of error must necessarily be sustained. We will, however, formally sustain only the third assignment and, before disposing of the questions raised by the other thirty-six assignments, await a decree made by the court below, whose rulings may not be in accord with those of the single judge who entered this decree, after a trial had in accordance with the views expressed above.

The third assignment of error is sustained and the decree is reversed with a procedendo.

MITCHELL, C. J., and POTTER, J., dissent.