Davis, Appellant, *v.* Pennzoil Company.

196

Argued November 21, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Norman J. Cowie,* with him *Robert S. Grigsby, John R. Walters,* and *Thomson, Rhodes & Grigsby,* for appellant.

*Edmund K. Trent,* with him *Jonathan L. Alder, Charles E. McGinnis,* and *Reed, Smith, Shaw & McClay,* for appellee.

OPINION BY MR. JUSTICE COHEN, April 22, 1970:

On April 6, 1965, appellant, Walter Davis, filed an action of assumpsit in the Court of Common Pleas of Allegheny County against the Pennzoil Company, appellee, on two causes of action. The first seeks recovery of $16,661,489, plus interest, for financial advice allegedly given to South Penn Oil Company (appellee's prior name) by appellant under an agreement to pay him at the prevailing rate in the custom of the trade if the recommendations were accepted and used in whole or part. The second seeks recovery of $1,000,000, plus interest, under an oral agreement to pay appellant at the prevailing rate in the custom of the trade if he would discreetly negotiate with Tidewater Oil Company,

if he were successful in learning that Tidewater's holdings in South Penn could be purchased at a given price and if South Penn were able to purchase those holdings. In addition to these causes of action which are pleaded on express contracts, there are two alternative causes of action in quasi-contract (if no express agreement existed) for the fair value of the alleged services in the identical amount claimed under the express contracts.

Taking the record in a light as favorable to appellant as possible, the factual background is as follows. James Breene, whose family had long been connected with the corporate affairs of appellee, and who was about to inherit stock in South Penn, met with appellant in Arizona in March, 1962. He explained to appellant that in his opinion South Penn "wasn't going any place" and that appellant with his extensive experience in corporate matters could be of great use to the company. He stated that John Selden, President, Chief Executive Officer, and Chairman of the Board of Directors of appellee, should want to know about any recommendations appellant might have. Over the next few months appellant studied South Penn's situation and formulated recommendations. He spoke with Breene several times about his ideas during this period. Towards the end of May, 1962 Breene contacted Selden and told him that Walter Davis would like to discuss with him some matters concerning South Penn. Breene told appellant that Selden had agreed to meet with him and had suggested that he have ready an outline of the plan. After an abortive attempt on June 11 in Pittsburgh, they met on June 24 in Toronto.

In the course of that meeting appellant outlined to Selden the plan he had developed.[1] In essence that

---

[1] In his amended complaint appellant alleges that the contracts upon which his claims are based are oral. In his deposition, how-

plan recommends that: 1. South Penn should advance continually the market price of its shares by purchase of its own shares on the open market on the American Stock Exchange. 2. South Penn should acquire Tidewater's holdings of its shares (amounting to 9-11% of outstanding shares) and thus eliminate a large bloc overhanging the market and eliminate a source of opposition to an expansion program. 3. South Penn should negotiate property-reserve acquisitions through shares of its stock which with South Penn leading the way will be increasing in value. 4. In addition South Penn should—a. increase the number of authorized shares from 1,715,000 to 10,000,000. b. change its listing from the American to the New York Exchange. c. change its name to Pennzoil Company. d. strengthen the board of directors by replacing those who retire by experienced corporate executives of national prestige. 5. South Penn should expand earnings through acquisition of additional oil and gas production and reserves through merger and/or purchase with shares at advanced prices. Also, there should be substantial extension of product-distributorships, plants and marketing facilities under experienced personnel. 6. South Penn should—a. issue quarterly reports to shareholders. b. split the shares as the market price advances. c. increase dividends. d. not make any purchases involving the issuance of any substantial amount of stock-conversion rights.

In his deposition appellant states that at that meeting Selden promised to compensate him to the extent of "10 per cent of the difference of the market price value of the outstanding shares of the company on use, adop-

ever, he admitted that Exhibit 26, a seven page typewritten document, was the plan submitted to Selden. Therefore, whether the agreement was oral or not, Exhibit 26 is the plan appellant submitted on June 24, 1962, and is the basis of the contract pleaded in count 1.

tion and completion or implementation of the plan as determined by me . . . compensation related to the difference between the market price of the outstanding shares on completion of the plan as compared to the market value of the outstanding shares at the time of the agreement by Selden to compensate me." Appellant also states that Selden agreed to pay him 10% of the purchase price to be paid for the Tidewater bloc if he discovered whether Tidewater would consider selling and the approximate asking price.

After the meeting in Toronto, correspondence between Selden and appellant continued, and on September 5, 1962 Selden informed Davis by letter that the South Penn Board of Directors had rejected his plan. On September 1, 1962 J. Hugh Liedtke had become president and chief executive officer of South Penn, and Selden had resigned.

Appellant asserts that as a result of his plan, the following changes were effected: a. on July 3, 1963, the corporate name of South Penn was changed to Pennzoil Company. b. during 1963 a series of mergers with other petroleum companies were consummated. c. beginning on July 8, 1963, the shares of appellee were listed on the New York Exchange. d. in January, 1964 appellee purchased Tidewater's equity in it. e. by June 12, 1964, appellee had increased its authorized shares to 10,000,000 and had declared a two for one split. f. subsequent to July 1, 1962, appellee increased its dividend. g. subsequent to July 1, 1962, appellee issued quarterly reports to its shareholders.

The procedural history is as follows. Appellant filed the complaint on April 6, 1965. On May 6, 1968, appellee served on appellant, under Pa. R.C.P. 4014, a request for admission of 544 writings. Appellant filed an answer on May 16 stating that he had not been able to read and comprehend the documents because of their volume and that the documents covered so many peo-

ple and locations that it was impossible for him to ascertain their accuracy. On June 5, 1968, appellee filed a motion for summary judgment, and on September 12, 1968, it filed preliminary objections to appellant's answer to the requests for admissions. This motion and these objections were argued before the court below on September 27, 1968, and on December 16 the court directed the entry of summary judgment in favor of appellee and declared that the requests for admissions were deemed to be admitted because appellant's answer was insufficient. Appellant then moved for reconsideration of the order relating to the requests for admissions and at the same time filed exceptions to the order for summary judgment and a motion to strike it off. Appellant next moved to have his motion for reconsideration listed for argument before the court (Judge OLBUM) and his exceptions and motions to strike listed for argument before a court en banc. On December 26 the court below denied both motions. At No. 145 March Term, 1969, appellant is appealing the entry of summary judgment; at No. 169 March Term, 1969, appellant is appealing from the two orders of December 26, 1968, denying argument on the post-judgment exceptions and motions.

The court below, 117 P.L.J. 343 (1969), granted a summary judgment on the first cause of action because the essence of the plan involved a violation of federal securities law, because Selden lacked authority to enter into such a contract, because the contract was made on a Sunday, because there was want of consideration in that appellant's ideas were neither novel nor concrete and because the contract was too uncertain and indefinite to be enforced. It granted summary judgment as to the second cause of action because the contract was made on Sunday, because Selden lacked authority and because appellant did not perform his obligation under the contract. The court granted summary judgment

on the alternative causes of action because delivery of the plan occurred on Sunday and because appellee received no benefit from appellant's plan. The court granted appellee's preliminary objections to appellant's answer to its request for admissions because it felt Pa. R.C.P. 4014 set no limits on the number of documents that could be included in such a request and considering the nature of the case the number was not unreasonably large nor beyond appellant's reasonable anticipation. It believed appellant made no attempt to determine the truth of any of the matters of fact when he should properly have been expected to spend considerable time on that.

All these matters are before this Court, plus the arguments by appellant that a single judge does not have power to enter summary judgment without the concurrence of the court en banc and that the court below abused its discretion in sustaining the preliminary objections to the answer to the requests for admissions because they were untimely, having been filed 119 days after the filing of the answer, and because the court should have permitted the filing of an amendment to the answer.

It is well settled that summary judgment should not be entered unless the case is clear and free from doubt, that the record must be viewed in the light most favorable to the nonmoving party, and that all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Mallesky v. Stevens*, 427 Pa. 352, 235 A. 2d 154 (1967); *Vrabel v. Scholler*, 369 Pa. 235, 85 A. 2d 858 (1952).

The court below found that the "dominant theme" of the plan appellant relies on as the basis of the contract pleaded in Count 1 involved a violation of federal securities law. Relevant to this issue are sections 9a(2) and 10b of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §78i(a)(2), 15 U.S.C. §78j(b),

which state respectively: "It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange to effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

The famous rule 10b-5 promulgated under §10b states: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

In order to determine how appellant's plan relates to these statutes, it is necessary to quote excerpts from that plan. "SP should advance continually the market price of its shares from the prolonged, rather static range in the low 30's commensurate with the carrying out of this program and general economic and market conditions. Such advance should be implemented by South Penn or one or more of its officials on its behalf, by purchasing shares of South Penn on the open market on the ASE. The relatively small floating supply of shares . . . of this long, generous dividend-payer, should make a relatively easy job of continually advancing SP's market price and such advance will be assisted substantially (if not taken over in a major way from time to time by the investing public and brokerage fraternity) when it becomes apparent through publicity and market action that SP has entered on an accelerated *expansion program*. At the moment, on the basis of 1961 earnings of $2.40 per share, SP's shares at around $32.00 are selling at only about 13 times earnings whereas they could and should be selling at least 20 to say 23 times earnings or around $48.00 to $55.00 per share. This 20 times (plus) ratio will materialize without difficulty as soon as the investing public learn that SP has embarked on a constructive aggressive expansion program. . . . The shares purchased in the open market as above mentioned as well as Tidewater's SP shares, if purchased, can, of course be used in negotiating future property acquisitions . . . then SP share market price could continually make new highs, with occasional market help of SP. South Penn's leading the way, from time to time, in continually advancing the market price of its shares consistent with the circumstances as mentioned, will be beneficial to the company in many ways, especially in establishing a much higher and more favorable price-structure basis on which to negotiate thru shares, well selected property-reserve

acquisitions in its expansion program. . . . *Earnings-expansion* through acquisition . . . (of reserve) . . . thru merger and/or purchase . . . with payment for same being made by the company out of its treasury and increased shares at advanced stock market prices for SP shares as above mentioned; . . ."

There are two elements to the conduct proscribed by §9a(2)—"(i) effecting the requisite series of transactions and (ii) doing so for the purpose of inducing the purchase or sale of such security by others." 3 Loss, Securities Regulation 1550 (2d ed. 1961).[2] It would almost seem that in drafting his plan appellant was trying to model his words on those contained in the statute. What Davis was proposing was that South Penn expand by "purchasing" companies cheaply with stock that was valued at high levels as a result of South Penn's own market activity and the effect that activity would have on the "investing public and the brokerage community." "Of course, it is axiomatic that it is the ticker record of a stock that attracts customers, and here, by buying purchasing power and increasing activity, there was attention called to the stock and a marked advance was achieved by it." *SEC v. Torr*, 22 F. Supp. 602, 608 (S.D. N.Y. 1938). The plan clearly envisages a series of transactions by appellee for the purpose of creating public interest in the stock and thus raising its price.

Appellant acknowledges that market manipulation of the type described is unlawful but argues that the

---

[2] Most of the opinions which have discussed §9a(2) contain merely a detailed statement of facts and a conclusion that under the circumstances contained therein §9a(2) has been violated. *Thornton v. SEC*, 171 F. 2d 702 (2d Cir. 1948); *Wright v. SEC*, 112 F. 2d 89 (2d Cir. 1940); *R. J. Koeppe & Co. v. SEC*, 95 F. 2d 550 (7th Cir. 1938); Archie H. Chevrier, CCH Fed. Sec. L. Rep. para. 77,231 (SEC 1965) Adams & Co., 33 SEC 444 (1952); Aurelius F. De Felice, 29 SEC 595 (1949); Kidder Peabody & Co., 18 SEC 559 (1945); Russell Maguire & Co., 10 SEC 332 (1941).

court below ignored portions of the exhibit from which inferences favorable to it could be drawn. He specifically refers to the language ". . . commensurate with the carrying out of this program and general economic and market conditions , . . ." This language, however, is extremely general and cannot detract from the very specific references to proposed conduct clearly violative of §9a(2). In addition, the following appears in appellant's deposition testimony: "Q. How would that be increased? How would you increase the price? A. By the company purchasing some of its shares in the open market. Q. To recreate a demand for the stock and make it go up? Is that what your idea was? A. By South Penn purchasing shares of its own stock in the open market at higher prices."

Appellant next argues that there is no prohibition against a corporation repurchasing its own shares on the open market. That is certainly true. See Note, Corporate Stock Repurchases Under the Federal Securities Laws, 66 Colum. L. Rev. 1292, 1293-95 (1966). The only question concerns the reason for the repurchase, and the wording of the plan plus appellant's own testimony graphically show that purpose to be violative of federal law.

Finally, appellant argues that the cases cited by the court below involved situations in which persons created an artificially high market in order to sell securities or exercise options and thus realize a profit. Regardless whether that is true or not, §9a(2) prohibits the effecting of a series of transactions for the purpose of inducing others to buy or sell and does not inquire in any way into why the individual engaged in that conduct. Also, in its proceeding against Genesco, Inc., CCH Fed. Sec. L. Rep. para. 77354 (1966), the commission forced Genesco to admit that it may have violated §9a(2) when it exchanged over 1,000,000 shares of its common stock for stock or assets of other companies at the same

time that it was purchasing large numbers of its shares in the open market for its Employee Stock Purchase Plan and its Special Stock Purchase Plan. This is almost exactly what appellant proposed.

As to the application of §10b and rule 10b-5, the Second Circuit Court of Appeals held in *SEC v. Texas Gulf Sulphur Co.*, 401 F. 2d 833 (2d Cir. 1968), that an insider, which would include the corporation itself, could not purchase shares of that company without disclosing to the public material facts. The court said, 401 F. 2d at 849, " 'The basic test of materiality . . . is whether a reasonable man would attach importance . . . in determining his choice of action in the transaction in question. . . . This, of course, encompasses any fact which in reasonable and objective contemplation might affect the value of the corporation's stock or securities. . . .' " Therefore, a corporation could not begin a program of purchasing its own stock in the open market for the purpose of creating investor interest in it and thereby driving up the price without disclosing that purpose to the public for such information would be material by any definition of that word.

As the commission stated in *Halsey, Stuart & Co., Inc.*, 30 SEC 106, 112 (1949): "It is of utmost materiality to a buyer to know that he may not assume that the prices he pays were reached in a free market, and the manipulator cannot make sales not accompanied by disclosure of his activities without committing fraud." See, also, *Thornton*, supra; *Chevrier*, supra; *Adams & Co.*, supra; 3 Loss, supra at 1561. Certainly what the commission said about sales would be valid for purchases also. It is just as important that sellers be able to assume that the prices they received were reached in a free market.

In the complaint the commission filed against Georgia-Pacific Corporation, CCH Fed. Sec. L. Rep. para. 91,680 (1966), it alleged that G-P had violated

10b and 10b-5 by not disclosing to the public that it was acquiring its own shares in the open market for its Stock Bonus Plan and its treasury during a valuation period (a period during which the market price of G-P shares would determine how many G-P shares would have to be issued to consummate a merger or an exchange of stock for stock or stock for assets) and that the number of G-P shares to be issued would not represent an independent consensus of buyers and sellers. In the consent decree that followed, *SEC v. Georgia-Pacific Corporation,* CCH Fed. Sec. L. Rep. para. 91,692 (1966), G-P agreed that upon commencing serious negotiations toward the acquisition of securities or assets of another person it would disclose its market activity in its own shares for the past 30 days and would give current information until negotiations were broken off or until the number of G-P shares to be issued or the formula for such had been fixed. In the Genesco, Inc. proceeding, *supra,* the company admitted that it may have violated 10b and 10b-5 by not disclosing its activity in its stock during periods of negotiation.

Therefore, appellant's plan called for violations of 10b and 10b-5 as to two time periods—(1) by not disclosing its manipulative intentions during the time it was buying shares to create public interest in the stock and (2) by not disclosing to prospective merger partners and recipients of its shares in exchange for stock or assets that the value of South Penn shares they would receive were inflated because of the company's manipulative activity.

Appellant argues that fraud cannot be presumed but must be proved by clear and precise evidence. The only way the plan would have been successful, however, would have been if the necessary disclosures had not been made. Certainly no prudent investor would deal in a stock if he knew the company was manipulating

its price, and no company would consider a merger or sale of assets for stock if it knew the value of the stock it would receive had not been set in a free market. Complying with the requirements of 10b and 10b-5 would have rendered the plan valueless, and under those circumstances there is no need for a finder of fact to hear evidence on the question. Therefore, we conclude that the court below properly found that an essential part of the plan violated federal securities law.

Section 29b of the Exchange Act, 15 U.S.C. §78cc (b) clearly states: "Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract . . . made the performance of which involves the violation of . . . any provision of this title, or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule or regulation, shall have made or engaged in the performance of any such contract. . . ." In addition, as a matter of state law, this Court will not enforce an illegal transaction, *Tucker v. Binenstock,* 310 Pa. 254, 165 Atl. 247 (1933), and this is particularly so when the illegality involves the violation of a federal statute. *Dippel v. Brunozzi,* 365 Pa. 264, 74 A. 2d 112 (1950).

Having determined that at least part of the plan pleaded as the basis of the contract in Count 1 is illegal, it is necessary to determine whether any recovery can be had on that part of the plan that does not violate federal securities law. Regardless whether the contract is seen as unilateral or bilateral, it is not of the type from which the illegal part can be excised. Restatement, Contracts, §606 states: "Except as this rule is qualified by the rules stated in sections 599-605 (not here relevant), where a single consideration for one or more promises in a unilateral bargain is illegal, the promises are unenforceable. But if legal executed consideration is apportioned to a corresponding promise

which is also legal, that promise is enforceable, unless the whole transaction involves serious moral turpitude or is prohibited by statute." Although the complaint alleged that consideration. was to be paid if the plan were accepted and used in whole or in part, section 29b of the Exchange Act is quite explicit in saying that every contract in violation of that Act or rules promulgated thereunder shall be void. Restatement, Contracts, §607 states: "Except as this rule is qualified by the rules stated in sections 578, 599-605 [not here relevant] where any part of a bilateral bargain is illegal, no promise can be enforced unless not only that promise is legal but a corresponding legal promise is, by the terms of the bargain, apportioned as consideration therefor, nor even in that case if the illegal portion of the bargain is an essential part of it." See *Deibler v. The Charles H. Elliott Co.*, 368 Pa. 267, 81 A. 2d 557 (1951). Even assuming the consideration had been apportioned, there is no question that the illegal portion of the bargain was an essential part of it. Therefore, there can be no recovery upon the contract pleaded in Count 1.

The court below held that appellant could not recover on the contract alleged in the Second Count because he had not performed his obligation under it. The record amply supports that finding.

Paragraph 28 of the complaint states in relevant part: ". . . it was further orally agreed and understood . . . that if plaintiff was successful through his efforts and negotiations in learning that Tidewater's holdings in South Penn could be purchased at a given price, and if South Penn was able to purchase said holdings of Tidewater, plaintiff was to be compensated. . . ." There were three things that had to happen before appellant became entitled to compensation— he had to discover if Tidewater were willing to sell, he had to discover at what price Tidewater was willing to

sell, and the transaction had to be consummated. An excerpt from appellant's deposition will indicate how he did not perform his obligation. "Q. How did you get that information [that Tidewater was willing to sell]? A. That information came to me through correspondence with Mr. Patrick [of Baird & Co. whom appellant had used to get information from Tidewater] which he had with the Tidewater people, photostatic copy of which he sent to me, and photostatic copy of which I forward through to Mr. Selden on, I believe, the 17th of August. Q. Will you look at those documents, please, and point out to me where that information is contained in, first, Exhibit No. 7, the letter of August 14 from Mr. Patrick,[3] and then Exhibit No. 6, the letter of August 15 from Mr. Patrick to you?[4] Where do you find that Tidewater holdings could be acquired for approximately $55 to $60 per share? A. Referring to that correspondence, and referring to the discussion Mr. Selden and I had about Tidewater at Skyline Hotel (June 24) at which time he told me that he didn't know it could be purchased, but he also heard the rumor around $56 to $58. We now refer back to Mr. Roth's letter, Mr. Roth of Tidewater Oil, where he says that 'while we have little desire to sell assets of this nature, if someone were to make an attractive offer we would certainly give it serious consideration. Such an

---

[3] The essential paragraph of that letter is as follows: "Mr. George F. Getty II and I have discussed the comment in your letter as to whether or not we would be interested in the sale of Tidewater's holdings in South Penn Oil Company. As I told you over the phone, while we have little desire to sell assets of this nature, if someone were to make an attractive offer we would certainly give it serious consideration. Such an offer would have to be substantially above present market price."

[4] That letter states that Exhibit No. 7 is enclosed and that if appellant were to make a good offer, "young Getty and Roth would do their best to persuade the elder Getty to approve it."

offer would have to be substantially above present market price.' Q. Present market price? A. The present market price at that time was approximately $30, $31, $32, in that area, and substantially above it would carry it up to the area of $56 to $58, as I told Mr. Selden in the letter of August 17 where I said to him: 'and you can deduce from Mr. Roth's letter that the price would be in the order of $55 to $60 per share as we discussed when we met at the Skyline Hotel last June.'[5] Q. In other words, you and Mr. Selden, in June, had talked about the price of $55 to $60 per share, and when Mr. Roth said that the price would have to be substantially about the present market price, from that you concluded that $55 to $60 a share would be sufficient to enable South Penn to get it? A. A logical deduction. Q. That is the only basis you have for the statement in Paragraph 30 that you found that Tidewater's holdings in South Penn could be acquired for approximately $55 to $60 per share? A. That's right."

It is true that appellant learned that Tidewater's holdings could be purchased, but he did not fulfill what he pleaded in paragraph 28 because he did not learn that they could be purchased at a given price. There is absolutely no basis for saying that $55-$60 is the "substantially above present market price" amount Exhibit 7 refers to. It is impossible to know what figure Roth contemplated, and it is evident that as appellant did not perform his obligations under the contract pleaded in the Second Count, he has no basis for recovery under it.

---

[5] That letter recites that Exhibits No. 6 and 7 are enclosed and states: "This now gives you in a confidential and reliable manner the information you asked me to obtain, namely, whether Tidewater would consider the sale of its South Penn share holdings; and you can deduce from Mr. Roth's letter that the price would be in the order of $55 to $60 per share as we discussed when we met at the Skyline Hotel last June."

As to the alternative causes of action, the court below found that appellant was not able to recover on a quasi-contract theory because his services were of no benefit to appellee and "it is fundamental that, to entitle one to restitution, he must show not only that there was unjust enrichment but that the party sought to be charged had wrongfully secured a benefit or, passively, had received one which it would be unconscionable for him to retain." *Brereton Estate*, 388 Pa. 206, 212, 130 A. 2d 453 (1957). The following requests for admissions by appellee show clearly that prior to June 24, 1962, South Penn had known of and had considered every individual idea contained in appellant's plan and in some instances had acted in pursuance of those ideas long before appellant came upon the scene.

| | | |
|---|---|---|
| 1. | Appellee's acquisition of its stock | 1001-1007 |
| 2. | Appellee's acquisition of its shares held by Tidewater | 2009-2045 |
| 3. | Appellee's acquisition of additional property and reserves with stock | 3001-3107 |
| | | 3401-3505 |
| | | 3700-3778 |
| | | 3801-3865 |
| | | 8001-8064 |
| 4. | Increase authorized capital | 4008-4017 |
| 5. | List shares on NYSE | 5012-5027 |
| 6. | Change Name to Pennzoil | 6011-6045 |
| 7. | Strengthen Board of Directors | 7001-7016 |
| 8. | Extend product-distributorships, plants and marketing facilities under experienced personnel, assisted by large scale international advertising | 9001-9081 |

| | | |
|---|---|---|
| 9. | Acquire full ownership of subsidiaries and affiliates | 10001-10027 |
| | | 10120 |
| | | 10140-10150 |
| | | 10160-10171 |
| | | 10174-10178 |
| 10. | Issue Quarterly reports to shareholders (this was required in order that the application for listing on the NYSE be approved) | 11001-11010 |
| 11. | Split Stock | 12001 |
| | Stipulation of Facts para. | 4005 |
| | | 4010 |

These exhibits indicate quite clearly that appellee received no benefit from the ideas contained in the plan, and thus appellant has no basis for recovery under the alternative cause of action in Count 1.

As to the alternative cause of action pleaded under Count 2, appellant contends that appellee received the benefit of his expert knowledge of corporate affairs and the information he conveyed and thus was able to purchase Tidewater's interest in it. Appellee's requests for admissions 2054-2062 show clearly that the negotiations leading to the sale were initiated by Tidewater when it made an offer by telegram on December 24, 1963. On December 30, 1963, appellee made a counter-offer by telegram, and Tidewater accepted it on January 2, 1964. In none of these communications was there any mention of appellant or anything to lead to the conclusion that his efforts helped bring about the transaction. Tidewater knew nothing about appellant or his dealings with the appellee, and it is difficult to see how appellant's services could have been of any benefit to appellee when it was Tidewater who made the first offer. Therefore, appellant cannot recover under this alternative cause of action.

Finally, we must decide the procedural matters appellant has raised. He argues, citing *Myers v. Consumers Coal Co.*, 212 Pa. 193, 61 Atl. 825 (1905), that a single judge does not have the power to grant summary judgment and that only a court en banc can do so. The record indicates that Allegheny County Local Rule 21a has been amended, effective May 1, 1969, to provide that motions for summary judgment are to be heard by the court en banc. Appellant asserts that this only codifies the existing law.

Our Pa. R.C.P. 249a provides "Except where the court is required to act en banc, a law judge may perform any function of the court. . . ." "Rule 249a is all inclusive in its provisions. With the exception of matters where action en banc is mandatory, there is no function of the court, in the conduct of a matter before it, which the individual law judge may not perform on behalf of the court, and which will not be presumed to be the act of the full court." Goodrich-Amram §249(a)-1. The Act of March 28, 1835, P. L. 88, §8, 12 P.S. §680 provides for hearing by a court en banc on motions for "new trials, and in arrest of judgment, and questions on reserved points", and the Act of March 11, 1875, P. L. 6, §1, 12 P.S. §645, states that a court en banc may set aside a judgment of nonsuit.

No statute, however, requires a court en banc to rule on a motion for summary judgment. *Myers*, supra, was an action in equity in which no court en banc passed upon exceptions to decrees nisi, see Pa. R.C.P. 1519b, and is inapposite. In *Mallesky v. Stevens*, 427 Pa. 352, 235 A. 2d 154 (1967), a single judge of the Court of Common Pleas of Allegheny County entered summary judgment in favor of an additional defendant, and *sub silentio* we approved that action. The court's order of December 16, 1968, is signed "By the Court: OLBUM, J.," and we feel the court below was acting

within its powers when it granted the motion for summary judgment and refused to list for argument before a court en banc appellant's exceptions and motion to strike. See Goodrich-Amram, §249(a)-2, n.17.

Lastly, appellant argues that the court below erred in granting appellee's preliminary objections to his answer to appellee's requests for admissions because the preliminary objections were untimely, having been filed 119 days after the answer was filed, and because the court should have given him the opportunity to amend his answer. He also asserts that the court below abused its discretion by refusing to permit argument on his motion to reconsider the prior ruling. Our rules do not explicitly provide a means by which a moving party may test the sufficiency of an answer to a request for admissions under Pa. R.C.P. 4014. It has been suggested, Goodrich-Amram, §4014(b)-8, *Hill v. Mayusky (No. 3)*, 22 Pa. D. & C. 2d 19 (1960), that the inquirer be permitted to file preliminary objections in the nature of a demurrer to its sufficiency. This will enable the parties to know prior to trial which facts are admitted and which must be proven and will free the inquirer from the dilemma of not knowing, while preparing the case for trial, whether the facts have been admitted or whether he will have to prove them. We approve such a procedure as furthering the purpose of Rule 4014, the avoidance of unnecessary preparation or proof.

The problem before us, however, is how long the inquirer has to file such preliminary objections. Appellant argues that as preliminary objections are pleadings a twenty day limit should be imposed. The court in *Hill v. Mayusky,* supra at 22, however, stated "(a)s to the time in which such a preliminary objection should be filed, we are of the opinion that it should not be filed so late as to delay the trial of the case, applying by analogy the not to delay the trial standard

of Rule 1034." This would appear to be a good standard. It would not prejudice the noninquiring party because he could assume the answer was sufficient and, if permitted by the court, could file an amended answer or take other appropriate measures if faced with an adverse determination. The only prejudice would be to the party responsible for the delay, the inquirer. If, faced with an answer of questionable validity, he decides not to object immediately, it is his preparation for trial that is made more difficult. This procedure was designed for his benefit; if he wishes to make his position more difficult, no one should object. Of course, all this presumes he acts so as not to delay the trial itself. The trial of this case was scheduled for January, 1969; the preliminary objections were filed September 12, 1968. We find that they were timely filed.

We need not decide whether under Pa. R.C.P. 1028c appellant could have filed an amended answer as of right within ten days of the filing of the preliminary objections. He did not so act and objects to the lower court's refusal to permit him to file an amended answer after it found his original one insufficient. See Pa. R.C.P. 1033. We find that the court's action was not an abuse of discretion considering that appellant's answer stated that he had not been able to read the documents or investigate their truthfulness because of their great length and that appellee on at least two occasions offered to give appellant additional time to study what are admittedly lengthy, but highly relevant documents. It was also not an abuse of discretion to refuse to reconsider this order.

Judgment and orders affirmed.