# Alexander v. Synthatron Corp.

*John Crayton,* for plaintiffs.

*William B. Moyer,* for defendant Consolidated Building Corp.

*Andrew Borek,* for defendant Synthatron Corp.

*Jeremy D. Mishkin* and *Dennis P. Lynch,* for defendant Union Carbide Corp.

KELTON, *J.,* April 24, 1991—The principal issue in this case is whether or not plaintiff is precluded from recovering damages for burns caused by an explosion in a chemical laboratory because one of the substantial factors in causing his injury was his own criminal conduct. We hold that plaintiff may not recover.

Following a trial held on January 3 through January 11, 1989, and a jury finding that plaintiff husband's attempted manufacture of methamphetamine was a substantial factor in causing his own injuries, we directed a verdict in favor of all defendants. The motion of plaintiffs, Raymond and Jann Alexander, for a new trial is now before us for consideration.

## FACTS

This litigation arose from injuries suffered by husband plaintiff as a result of a chemical explosion and fire at Petrarch Systems Inc. on the evening of February 23, 1982. At that time, plaintiff was employed by Petrarch as a laboratory technician.

Plaintiff and his wife brought this action against Synthatron Corporation as the seller of dichlorosilane, a chemical alleged by plaintiff to be the cause of the explosion; Consolidated Building Corporation, the general contractor who built the Petrarch facility, which plaintiff averred was unsafe; and Gordon K. Palmer, the architect hired by Consolidated to design the Petrarch facility. Union Carbide Corporation, the manufacturer of the dichlorosilane sold to Petrarch by Synthatron, was later joined by Synthatron as an additional defendant. Plaintiffs' claims against Synthatron and Union Carbide were based upon theories of strict liability, breach of warranty and negligence. Their claims against Consolidated and Palmer were based upon a theory of negligence.

A principal fact issue at trial was whether criminal activity by plaintiff was a cause of the explosion and fire. Some of the evidence on that issue has been summarized in the brief submitted by defendant Union Carbide:

"On February 23, 1982, [plaintiff Raymond Hossbach Alexander] was employed as a laboratory technician at Petrarch, a company which manufactures and distributes specialty chemicals. (N.T. 1/15/89, at 150.)

"On the day of the incident, Hossbach arrived at work at approximately 4 p.m. and began working in what was known at Petrarch as the '22 liter room.' Earlier that day, Hossbach's employer, Dr. Barry Arkles, had set up, in the same room, a chemical

reaction in a contained, pressurized vessel known as an autoclave. The chemical reaction involved two substances, trifluropropane and dichlorosilane.

"Hossbach testified that when he arrived at work the reaction was running and that he was asked by Dr. Arkles to check the reaction periodically and turn off the heater for the autoclave when the reaction reached a certain temperature. (N.T. 1/15/89, at 152-57.) At approximately 7:30 p.m., however, an explosion and fire occurred in the 22-liter laboratory room, as a result of which Hossbach sustained injuries to his head, back and right hand. (N.T. 1/15/89, at 169-73.)" (Defendant, Union Carbide's, brief in opposition to plaintiffs' motion for new trial at 5-6.)

Plaintiff was the only person in the lab at the time of the accident and the only eye-witness to the explosion and fire. The outside investigation of the accident scene was inconclusive. Consequently, neither side could present any direct evidence from anyone other than plaintiff as to the cause of the explosion and fire. Each party relied significantly on the circumstantial evidence.

Plaintiff contended that the autoclave which contained the hydrosilation reaction had exploded, and that the explosion then caused the ignition of a large flask of ether which was next to the autoclave, spreading fire throughout the lab. Plaintiff alleged that this explosion was due to a defect in the dichlorosilane or a failure to warn as to its proper use.

Defendants offered evidence which suggested a very different scenario as to what had occurred on the night of February 23, 1982. Defendants provided evidence from which the jury might conclude that the explosion and fire were not caused by the

legitimate hydrosilation reaction in the autoclave, but by a reaction of chemicals that plaintiff was running to manufacture methamphetamine. Defendants introduced testimony that there was no legitimate reason to have ether in the lab that night and that ether was usable in the manufacture of methamphetamine. Other evidence of a criminal purpose included the following:

(1) A 1976 guilty plea in Tioga County by plaintiff to conspiracy and attempt to manufacture a controlled substance, for which plaintiff received a state prison sentence. In that incident, plaintiff admitted that he was involved in the manufacture of methamphetamine and was injured when the methamphetamine lab caught fire. Additional information as to this incident was elicited through the cross-examination of plaintiff as to a joint stipulation of facts entered into between him and the government in proceedings in the United States Tax Court in 1979;

(2) A 1977 guilty plea by plaintiff in California to possession of PCP, a controlled substance. This drug was also involved in plaintiff's Tioga County manufacture of methamphetamine;

(3) A 1981 guilty plea in federal court to conspiracy to manufacture and distribute methamphetamine;

(4) Plaintiff's 1978 testimony before a Pennsylvania Special Senate Committee investigating drug laws in Pennsylvania in which plaintiff, testifying as an expert in methamphetamine manufacturing operations, explained that there are likely many people working in industry with chemical materials who are able to manufacture illicit drugs while working on legitimate jobs;

(5) Plaintiff's 1977 testimony as a prosecution witness in a federal criminal case about the necessary ingredients in the manufacture of methamphetamine;

(6) Testimony by two Petrarch employees, Dr. William Peterson and Kevin King, as to an incident occurring on Saturday night, August 28, 1982, several months *after* the instant February 23 explosion and fire. Plaintiff, although then no longer an employee of Petrarch and not authorized to be on the premises, was discovered by Mr. King working late in a Petrarch lab on a chemical reaction. A police scanner was beside him, and the building's burglar alarm had been turned off. When King asked plaintiff what he was doing, plaintiff told him that his activities were none of King's business. (N.T. 1/10/89, at 157-62.) Dr. Peterson inspected the lab set-up, and testified that the chemical reaction was one which is used to manufacture P2P, a precursor to methamphetamine. (N.T. 1/4/89, at 23-25.)

## *Does Plaintiff's Criminal Activity Bar Recovery?*

The primary issue for consideration is whether the court erred in submitting the following initial question and instruction on the verdict sheet given to the jury.

"(1) Do you find that at the time of the accident, plaintiff *Raymond Hossbach Alexander* was attempting to produce methamphetamine, *and* that such activity was a substantial factor in causing the harm to him?

"(If your answer to Question no. 1 is 'Yes,' plaintiffs cannot recover, and you should return to the courtroom. If your answer to Question no. 1 is 'No,' proceed to Question no. 2.)"

The jury was charged that, as a matter of law, if plaintiff was engaged in criminal activity and if such activity was a substantial factor in causing plaintiff's harm, plaintiff was precluded from recovery for such harm. (N.T. 1/11/89, at 119-24.) We believe this principle is supported by existing Pennsylvania law.

We note preliminarily that it is within the discretion of the trial judge whether or not to submit special interrogatories to a jury. *Walsh v. Pennsylvania Gas and Water Company,* 303 Pa. Super. 52, 449 A.2d 573 (1982). Generally, the determination is made on the basis of whether such special findings would add to a logical and reasonable understanding of the issue. *Willinger v. Mercy Catholic Medical Center,* 482 Pa. 441, 393 A.2d 1188 (1978); *Krock v. Chroust,* 330 Pa. Super. 108, 478 A.2d 1376 (1984).

Here, the principal defense was that plaintiff's injuries were not due to any defect in defendants' product but were, instead, directly caused by plaintiff's methamphetamine manufacture. It was, therefore, well within the discretion of the trial judge to fashion the verdict sheet question in this manner. There was sufficient evidence presented by defendants to permit the jury to conclude that if plaintiff's criminal activities on the night of February 23, 1982 were a substantial factor in causing his injuries, the need to deliberate further as to the liability of defendants was unnecessary.

Although we are unaware of any Pennsylvania cases involving criminal conduct as a defense to product liability actions, we believe that our decision is fully supported by existing case law in analogous areas. Our submission of the special interrogatory was based upon the common law principle that "a person will not be permitted to profit by his own wrong, particularly by his own crime." *Giacobetti v. Insurance Placement Facility*

*of Pennsylvania,* 500 Pa. 447, 457 A.2d 853 (1983), quoting *Greifer Estate,* 333 Pa. 278, 5 A.2d 118 (1939). In *Contractor Industries v. Zerr,* 241 Pa. Super. 92, 359 A.2d 803 (1976), in determining whether a contract was illegal, the court further explained this principle:

"A court's refusal to enforce an illegal contract is motivated by a desire to promote goals transcending the isolated litigation before the court:

" 'The principal of public policy is, that no court will lend its aid to a man who grounds his action upon an immoral or illegal act . . . [P]rinciples of public convenience demand that the justice of the case shall yield to higher considerations, the operation of the precedent on public morals and the public interest. It is for those reasons courts of justice will not assist an illegal transaction in any respect.' " *Id.,* quoting *Fowler v. Scully,* 72 Pa. 456, 467 (1872).

This principle has been applied by Pennsylvania courts in a variety of civil actions including tort proceedings. For example, in *Feld & Sons Inc. v. Pechner, Dorfman, Wolfee, Rounick and Cabot,* 312 Pa. Super. 125, 458 A.2d 545 (1983), a legal malpractice case, plaintiffs, who allegedly committed perjury, falsified exhibits and bribed a potential witness on the advice of and with the assistance of their attorneys, were precluded from recovering compensatory and punitive damages in their action against the attorneys for malpractice, infliction of emotional distress, deceit and breach of contract. The court's decision was based upon the common law doctrine that no court will lend its aid to a man who grounds his action upon an immoral or illegal act.

Generally, in contract cases, the Pennsylvania courts will not enforce an illegal transaction. See e.g., *Davis v. Pennzoil Company,* 438 Pa. 194, 264

A.2d 597 (1970) (proposed financial plan in violation of the Securities Exchange Act of 1934); and *Dippel v. Brunozzi,* 365 Pa. 264, 74 A.2d 112 (1950) (contract violating price control regulations).

In insurance cases, it is well established that the insurer has the right to refuse to pay to the insured for loss caused by the arson of the insured. *Maravich v. Aetna Life and Casualty Company,* 350 Pa. Super. 392, 504 A.2d 896 (1986); *Mineo v. Eureka Security Fire and Marine Insurance Company,* 182 Pa. Super. 75, 125 A.2d 612 (1956).

Our legislature, for obvious reasons, has declared that the unauthorized attempt to manufacture methamphetamine is a crime. We do not believe that the law should permit these plaintiffs to recover in circumstances where the husband-plaintiff's criminality was a substantial factor in causing plaintiff's injury. See *Feld & Sons Inc. v. Pechner et al., supra.*

## Admissibility and Sufficiency of the Evidence

Plaintiffs claim the court erred in admitting defendants' evidence as to plaintiff's prior and subsequent criminal conduct as substantive circumstantial evidence of plaintiff's conduct on the night of the Petrarch explosion and fire.

In criminal law, evidence of one crime is generally inadmissible against a defendant being tried for another crime. *Commonwealth v. Rose,* 483 Pa. 382, 396 A.2d 1221 (1979); *Commonwealth v. Lasch,* 464 Pa. 573, 585-86, 347 A.2d 690, 696 (1973). However, evidence of other crimes may be admissible when it tends to prove motive, intent, absence of mistake or accident, or a common scheme, plan or design involving the commission of two or more crimes so

closely related that proof of one tends to prove the others, or to establish the identity of the person charged with the commission of the crime on trial. *Commonwealth v. Peterson,* 453 Pa. 187, 307 A.2d 264 (1973). The trial court must balance the need for the evidence against its potential prejudice in order to determine its admissibility. *Commonwealth v. Shirey,* 333 Pa. Super. 85, 481 A.2d 1314 (1984). Here, we found that the prejudicial effect of the evidence was outweighed by its probative value. (See in camera hearing and argument at N.T. 1/3/89, at 127-55, and our findings on this issue at 155-62.)

The similarities between the events in question are striking.

Comparing testimony as to the Tioga County incident in 1976, the Petrarch accident of February 23, 1982, and plaintiff's subsequent behavior on the night of August 28, 1982, certain obvious similarities suggest a common plan of behavior. The Tioga incident, which resulted in plaintiff's conviction for conspiracy and attempt to manufacture a controlled substance, involved a laboratory created by plaintiff for the manufacture of methamphetamine. That lab suffered a major fire and explosion in which plaintiff was injured. Ether, a raw material used in the manufacture of methamphetamine, was present at the Tioga lab and at Petrarch on both February 23, and August 28. (See N.T. 1/3/89, at 137; N.T. 1/4/89, at 12-15; N.T. 1/4/89, at 23; N.T. 1/5/89, at 219-21, 227; and N.T. 1/10/89, at 160-61.)

The testimony revealed as well that because of the extremely flammable nature of ether, it would not have been normal practice for it to be in the Petrarch lab on August 28 and that the reaction plaintiff was running at Petrarch was not authorized. (N.T. 1/4/89, at 125; N.T. 1/10/89, at 161-62.) In addition to the ether, other chemicals were also found in the lab

at Petrarch which were not normally kept there and were not being used in any authorized reaction at Petrarch. (N.T. 1/4/89, at 24-25, 30-32; N.T. 1/10/89, at 159-61.) Moreover, it was Dr. Peterson's testimony that he had investigated the reaction set up by plaintiff on August 28 and that if it was running, such a reaction was capable of causing the explosion and fire damage that occurred on February 23.

Also, on August 28, plaintiff's employment had terminated and he was not authorized to be in the building at all.

Comparing the night of February 23 with the Tioga County incident and plaintiff's activities at Petrarch in August, again, a large quantity of ether was present in the lab in which plaintiff was working. None of the authorized reactions which were in progress on that February evening required the use of ether. (N.T. 1/3/89, at 138; N.T. 1/4/89, at 29.) A number of other chemicals not normally in the lab and not a part of any authorized reaction were also present. (N.T. 1/4/89, at 30-32.)

It thus must be concluded that evidence of plaintiff's prior and subsequent methamphetamine activities was appropriately admitted by the court as evidence of a common plan or scheme to show his motive and intent on the night of February 23, 1982 and to prove that the fire was not caused by a defect in the dichlorosilane.

In civil actions, evidence of prior as well as subsequent conduct is admissible as substantive proof of what happened on another date. See e.g., *Boyer v. Boyer,* 183 Pa. Super. 260, 130 A.2d 265 (1957) (divorce proceedings); *Homewood People's Bank v. Marshall,* 223 Pa. 289, 72 A. 627 (1909) (bank fraud); and *McConnell v. Hill,* 348 Pa. 414, 58 A.2d 158 (1948) (will forgery).

In order to avoid any prejudice to plaintiff, the jury was cautioned by the court on several occasions to consider this evidence only for the purpose of determining what had caused the Petrarch fire and explosion on February 23, 1982. (See N.T. 1/4/89, at 20; N.T. 1/5/89, at 222-23, 237.) We believe these limiting instructions were appropriate.

We conclude, therefore, that no trial error was committed by the admission of this evidence and that when considered in its entirety, it was sufficient to sustain the jury's finding that plaintiff's criminal conduct was a substantial factor in causing his own injuries.

## Other Evidence Rulings

Plaintiffs' remaining claims of error address numerous evidentiary rulings regarding fire safety codes and the dangers of dichlorosilane. As noted, the jury was instructed that if it found that plaintiff's illegal activities were a substantial cause of his injuries, plaintiff was precluded from recovery and it should not address the remaining questions as to liability of defendants. Consequently, if we were correct in such instructions, then any errors in the following evidentiary issues would be considered harmless error at best.

It is well settled that not every violation of the rules of evidence requires a new trial; where the error has worked no harm to appellant, a new trial will not be in order. *Stern v. Vic Snyder,* 325 Pa. Super. 423, 473 A.2d 139 (1984); *Wistler's Sportswear Inc. v. Rullo,* 289 Pa. Super. 230, 433 A.2d 40 (1981). If we did err in our instructions in Question no. 1, plaintiffs would be entitled to a new trial and, therefore, the remaining evidentiary issues would be

moot. Nevertheless, we will address plaintiffs' remaining post-trial averments briefly.

Plaintiffs first contend that the court erred in refusing to allow their fire safety expert, Mr. Richard Bright, to testify as to the alleged non-compliance of defendants Consolidated Building Corporation and Gordon K. Palmer with national fire safety codes. Plaintiffs also claim that the jury was improperly instructed as to those national codes which had been adopted in Pennsylvania.

Mr. Bright was asked by plaintiffs' counsel:

"*Mr. Crayton:* Do you have an opinion, Mr. Bright, as to whether or not the use of outward swinging doors, illuminated exit signs, panic hardware on the outward swinging doors, emergency lighting, explosion-proof lighting, and wet pipe sprinkler systems would have limited the injuries to my client?" (N.T. 1/9/89, at 143.)

We sustained defendant's objections to this question, citing *Kozak v. Struth*, 515 Pa. 554, 531 A.2d 420, 424 (1987), which holds that expert testimony on issues of ultimate fact must be carefully scrutinized. While courts have permitted expert witnesses to testify to the ultimate issues, their testimony is limited only to those occasions where such opinion will not cause confusion or prejudice. We also believe that our instructions as to the applicable fire safety code sections were proper under the evidence of what the architect, builder and regulatory authorities knew about the proposed building use.

Plaintiffs' final claims of error concern the alleged exclusion of evidence from Dr. Weisfeld as to the hazardous qualities of dichlorosilane allegedly known to defendants Union Carbide and Synthatron, and the court's limiting of the cross-examination of Doctors Robert Kaiser and

Martin Prince, representatives of defendants Union Carbide and Synthatron, respectively.

Upon review of the record, we have found no error in limiting plaintiffs' expert, Dr. Weisfeld, to the "fair scope" of his pretrial report as defined in Pa.R.C.P. 4003.5. We also believe that plaintiff was given ample opportunity to develop for the jury his theory that the explosion and fire were caused exclusively by defendant Union Carbide's dichlorosilane and not by plaintiff's attempt to manufacture methamphetamine.

## ORDER

And now, April 24, 1991, plaintiffs' post-trial motion for a new trial is denied, and judgment is hereby entered on the jury's verdict.